**STATE of Tennessee, Appellee,**

v.

**Edward Leroy HARRIS, Defendant–
Appellant.**

Supreme Court of Tennessee,
at Knoxville.

May 11, 1992.

Rehearing Denied Sept. 8, 1992.

**56** 

Charles W. Burson, Attorney General & Reporter, Jerry Lynn Smith, Deputy Atty. Gen., C. Anthony Daughtrey, Asst. Atty. Gen., Nashville, Counsel on Appeal, Al Schmutzer, Jr., Dist. Atty. Gen., and Richard Vance, Asst. Atty. Gen., Sevierville, Trial Counsel, for appellee.

Charles S. Sexton, Ogle, Wallace & Sexton, Sevierville, Trial and Appellate Counsel, William H. Goddard, deceased, Trial Counsel, A. Benjamin Strand, Jr. Strand & Goddard, Dandridge, Counsel on Appeal, for defendant-appellant.

## OPINION

DROWOTA, Justice.

The Defendant, Edward Leroy Harris, alias "Tattoo Eddie," was found guilty by a Sevier County jury of the murders of Melissa Suttles Hill and Troy Dale Valentine on the evening of Saturday, September 13, 1986. The jury found three aggravating circumstances, T.C.A. § 39–2–203(i)(2), (5), and (7),[1] and sentenced the Defendant to

---

1. T.C.A. §§ 39–2–203(i) [Now T.C.A. § 39–13–204(i) (1990 Supp.) ]—No death penalty shall be imposed but upon a unanimous finding, as heretofore indicated, of the existence of one or more of the statutory aggravating circumstances, which shall be limited to the following:

death. Counsel for the Defendant, in an abundance of caution due to the severity of the case, have raised 52 errors in a 283 page brief. We have carefully considered all of Defendant's assignments of error; and, for the reasons that follow, a majority of the Court affirm Defendant's guilt and his sentence of death. Two members of this Court, finding error in both the guilt and sentencing phases of this case, would reverse and remand for a new trial.

The victims were both employees of the Rocky Top Village Inn in Gatlinburg. Twenty-one-year-old Melissa Hill was a desk clerk and Troy Valentine was a night security guard. Their bodies were discovered in a room in the motel the night of September 13, 1986. The motel's main office was located on Airport Road and a separate smaller office was on Reagan Drive. On the evening of the murders, Robert Bennett was working in the main office and Melissa Hill had the 3–11 p.m. shift and was working alone in the Reagan Drive office. Bennett last talked to Hill at approximately 7:30 to 8:00 p.m. He telephoned her shortly after 10:00 p.m. and received no answer. However, her husband, a dispatcher with the police department, had talked to her at approximately 10:30 p.m. When Bennett received no answer between 10:30 and 10:45 p.m., he asked Troy Valentine, the security guard, to investigate. The 36–year–old Valentine was unarmed, but carried a police-type flashlight.

Melissa Hill's husband called her again at approximately 11:00 p.m. and received no answer. Bennett, not hearing from Troy Valentine or Melissa Hill, became concerned and left the Airport Road office and went to the Reagan Drive office about 11:30 p.m. He noticed that the lights were on in the office and in the two-bedroom suite next to the office. He looked through the motel room's window and saw the body of Valentine lying on the floor and immediately called the police.

When the Gatlinburg police arrived, they found the bodies of Valentine and Hill in the motel suite. Valentine was lying on his back on the kitchen floor and Hill was lying on her back in a prone position leaning against the bed and the wall. It was determined that $499.00 had been taken in a robbery of the motel and Hill's purse was missing.

Dr. Cleland Blake, a forensic pathologist, went to the scene of the murders during the early morning hours of September 14. He saw a flashlight, which was still burning, and a handcuff attached to Valentine's left-wrist. Valentine was lying in a pool of blood that spread 15 to 18 inches away from his body. Hill had massive amounts of blood around her neck and her shirt was heavily soaked in blood from her neck to her waist. There was blood on her blue-jeans and on the carpet.

Dr. Blake's autopsy revealed that Melissa Hill had been shot at close range in the top left side of her head with a small caliber bullet. She had been stabbed 18 times. The fatal injury was a deep thrust wound across her neck that had cut the trachea and the neck's major blood vessels and had chipped the spinal column. The wound, described by Dr. Blake as "very savage," had been made by working the knife in and out three times. Hill had also suffered potentially fatal wounds to the heart and the lungs. Dr. Blake opined that she had been stabbed before she had been shot. She had a defensive slash wound on her right palm and three superficial wounds on the back of the neck. Intense, discolored bruises on her left wrist indicated to Dr. Blake that something had "constricted around the wrist" and that she had

(2) The defendant was previously convicted of one or more felonies, other than the present charge, which involve the use or threat of violence to the person;

(5) The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind;

(7) The murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb....

yanked her hand hard against a metal surface, such as a handcuff.

The autopsy of Troy Valentine revealed several stab wounds on his chest and back and lacerations to the back of his head. He suffered a deep stab wound into the bone of the jaw and a large stab wound that went into his neck. A laceration on the top of his head was inflicted by a round object of about an inch and a half to two inches in diameter, which was consistent with his flashlight. He had a gunshot entry wound between his eyes. Death was caused by either the gunshot wound or the stab wound in his neck. Dr. Blake opined that Valentine was first struck on the top of the head and rendered unconscious, then shot, then stabbed. Valentine and Hill each had a deep neck wound with features of sharp, sawtooth markings from a knife with a serrated edge.

An envelope marked "Please give to a policeman" was found on September 16, 1986, in a phone booth near the Maggie Valley, North Carolina, police station. Inside the envelope was a letter and a small knife given to Hill by her husband that she normally kept in her purse. The letter, which was read into the record, asked for forgiveness "for killing those two people in Gatlinburg" and expressed its author's remorse. The author explained he "was just wanting the money" and had intended to leave the two victims handcuffed in the room. When, however, the guard tried to take the writer's gun, "Joe seen him" and hit the guard with the light. According to the letter, Joe then "went crazy, cut them up," and forced the writer to shoot the victims. The author of the letter admitted he had shot the guard between the eyes but hoped that he had missed the woman. He was afraid that Joe would have killed him if he had not done what he said. He hoped that the victims had no children and he remarked that he could not sleep and was sorry it happened. He was returning the woman's knife because "it might mean something to someone."

Joseph DeModica's testimony was crucial to the State's case. He testified that he, Harris, and transvestite Rufus Doby (also known as Ashley Silvers) met in Fort Lauderdale, Florida, in late August 1986. They drove to Daytona, Florida, and then to Georgia, where Kimberly Pelley, Harris's girlfriend, joined them. The four then traveled to Knoxville, where DeModica had worked as a male stripper at a bar called The Pepper Tree. DeModica thought he and Harris could obtain jobs as male strippers; upon arriving in Knoxville they went to The Pepper Tree, where DeModica borrowed money from a friend for the purpose of obtaining a motel room for the night.

On Monday the week of the murders, the foursome (Harris, Pelley, DeModica and Silvers) went to the Knoxville residence of Tracey Clark, a friend of DeModica. With Clark's permission, they slept in the car in her driveway. The group also spent Friday night in Knoxville at the apartment of Tim Farmer, another of DeModica's friends. Harris and DeModica indicated to Farmer that they intended to return to Gatlinburg on Saturday and would not be performing that night at The Pepper Tree. On the afternoon of Saturday, September 13, Harris, Pelley, DeModica, and Silvers left Farmer's apartment. Later that day in Dandridge, they tried to sell a leather coat, a mink coat, and a radio they had stolen from Farmer to Johnnie Shultz, another of DeModica's acquaintances. She refused to purchase the merchandise, believing it to be stolen. They did sell the radio at a service station and the leather coat at a bar.

The testimony of DeModica, Tracey Clark, Tim Farmer, and Jeff Tulle, Farmer's neighbor, showed that while in Knoxville Harris carried two knives, a lock-blade knife in a leather sheath on his belt and a large hunting knife with a serrated edge. Farmer testified that Harris and DeModica indicated to him that they had a gun in the Toyota. Farmer had also seen a pair of handcuffs hanging on the rear view mirror of the Toyota. Farmer related how Harris had told him about a friend of his who liked to get people high, handcuff them to trees, and do obscene things to them.

DeModica's testimony was the only direct evidence of the circumstances of the

murders. He told how on September 13, the foursome drove through Pigeon Forge and Gatlinburg and on to the Laurel Falls area of the Great Smoky Mountains National Park. After they walked to the falls, they returned to Gatlinburg, where Harris suggested they rent two motel rooms for the night. DeModica admitted that he "knew something was going to happen." The group drove to the Rocky Top Village Inn. Kimberly Pelley got out of the car and went into the office and came out with Melissa Hill, who accompanied her into the motel room next to the office. The Defendant, Harris, then got out of the car and followed Pelley into the room. The three next came out of the room and went back into the office. Hill and Pelley went behind the desk. There was "a little commotion," after which the three returned to the adjoining motel room. DeModica, who was standing in the parking lot with Silvers, saw a knife in Pelley's hand as they returned to the motel room. DeModica was unable to see into the room; however, he heard "a couple of noises, like a couple of bumps," and a loud scream and a muffled scream. A security guard drove up in a golf cart and went directly to the office. When the guard started for the room, Harris came out. The two men exchanged words and began to fight. As the guard began to overpower Harris, Pelley came out of the room, took the guard's flashlight and struck him over the head with it. Harris and Pelley then dragged the guard into the room. DeModica heard another bump and a grunt and Harris screaming, "If you don't do what I tell you to do, you'll wind up like them!" Immediately, two gunshots followed. Harris and Pelley came out of the room carrying a gym bag and purse and looking like they had been sprayed with red paint. The four drove straight back to Knoxville, where DeModica and Silvers spent the night in Tracey Clark's car while Harris and Pelley left in the Toyota. The next morning the four washed their clothes at a laudromat, then left Knoxville and drove to Nashville, where they remained for a few days. While there, the Defendant told DeModica that he might have hurt or killed someone.

DeModica and Silvers left the Defendant and Pelley in Nashville and drove back to Knoxville and then to Gatlinburg, where they were detained and questioned by the Gatlinburg police about possessing a stolen vehicle and participating in the murders. DeModica first denied knowledge of the murders, but then told the police that "they were looking for the wrong person." Fifteen months later, while DeModica was in Georgia, officers again questioned him about the murders.

The State called several witnesses to corroborate the testimony of DeModica. Tracey Clark confirmed that Harris, Pelley, DeModica and Silvers slept in a car in her driveway in early September 1986. Tim Farmer confirmed that the four had spent the night at his apartment on the Friday before the murders. He also stated that Harris had two knives and further testified that when he returned to his apartment Saturday afternoon he found a fur coat, a leather coat, and a radio missing.

Jeff Tulle, who lived in an apartment above Farmer, stated that he saw the Defendant Saturday morning, September 13, and that later the same day he heard Tim Farmer complaining about being robbed. Johnnie Shultz testified that she refused to purchase the fur coat and leather jacket on that Saturday, believing the items were stolen.

On December 16, 1987, Harris was arrested in Atlanta, Georgia. He told a TBI agent that he had never been to Gatlinburg. In a series of contradictory and ambiguous statements given to TBI and Georgia law enforcement officers shortly after his arrest, he denied participating in the killings and implied that DeModica and Silvers were the murderers. He denied being in Knoxville with DeModica and Silvers. He denied meeting Tim. Subsequently, he denied going to Gatlinburg, unless, he added, Pelley said they had been there. He denied going to Maggie Valley and denied spending the night at the home of anyone named Tim. He stated that it was DeModica who had a knife in the car and a pair of handcuffs. He later admitted being in Pigeon Forge.

Thomas Vastrick, a United States Postal Inspector at the Service Crime Laboratory in Memphis, who was an expert in questioned documents, examined the Maggie Valley letter and handwriting exemplars from Harris, Pelley, DeModica and Silvers. He concluded that the Maggie Valley letter was not written by Pelley, DeModica, or Silvers. He found indications that the Defendant wrote the Maggie Valley letter and requested additional exemplars in order to make a conclusive identification. Harris refused.

The testimony of DeModica and the Maggie Valley letter were two key factors in the State's case. In order to link the Defendant to the Maggie Valley letter, the State next introduced the testimony of Antonia Jones, the Defendant's former girl friend. She had known the Defendant for three and a half years and they had lived together for almost two years. For a year and a half, she had worked with Harris to improve his writing ability. She testified that the printing on the Maggie Valley letter "looks like Eddie's to me." After introducing a valentine card and describing love notes and letters he had written her, she described in detail certain characteristics used in the Maggie Valley letter and, when asked, "Are you positive that this Defendant wrote that letter?," responded, "Yes, I am." The State rested.

The Defendant did not testify. Judith Jones, mother of Antonia Jones, testified for the Defendant and questioned the credibility of her daughter. Mrs. Jones stated, "[s]he would tell the truth, to the best of her knowledge, but her knowledge is colored a great deal by emotions ... [t]o the point that it is very doubtful that she would be a ... reliable witness." A TBI fingerprint expert testified that the Defendant's fingerprints were not found in the motel room. The defense pointed out that while no physical evidence connected Harris to the crime, a hair from a black person was obtained from the victim Valentine.

At the sentencing hearing, the State introduced exemplified copies of prior judgments of convictions showing that the Defendant was convicted in Georgia of rape,

armed robbery and aggravated sodomy. The Defendant had been sentenced to 15 years imprisonment for these offenses, which had been committed on January 27, 1976.

The Defendant testified at the sentencing hearing that he was 32 years of age, was born in Baltimore, Maryland, and grew up in Ashville, North Carolina. He went only as far as the third grade of school and left home when he was 14 years old. His father is now deceased and his mother lives in Atlanta, Georgia. He further testified that he is unable to write without assistance and has a limited ability to read. He was 18 years of age when he was convicted in Atlanta, Georgia. He admitted pleading guilty to the charges, but claimed that the victim engaged in sex voluntarily and fabricated the charges when she was discovered by her parents. He served 10 years in the penitentiary. He married when he was young and had two children in foster care. He first met Joe DeModica four to five years earlier in the Georgia penitentiary.

Defendant has submitted for our review numerous issues. We have reorganized and rearranged these issues in an attempt to treat many of the related issues together.

## CHANGE OF VENUE

Defendant first asserts that the trial court erred in failing to grant a change of venue. A defendant may seek to change venue if it appears that a fair trial probably could not be had due to undue excitement against the defendant in the county where the offense occurred. Tenn. R.Crim.P., Rule 21(a). The question lies in the sound discretion of the trial court, whose decision must be respected absent a clear abuse of discretion. *Rippy v. State*, 550 S.W.2d 636, 638 (Tenn.1977). The Defendant avers that the trial court's refusal to grant him a change of venue was a clear abuse of the judge's discretion as required by Rule 21(a).

After a lengthy pretrial hearing on the motion to change venue, the trial court reserved making any judgment and took the motion under advisement, stating that

he would attempt to select a jury panel before making any further ruling on the change of venue motion.

At the time of the crime (September 1986) and at the time of the arrest and pretrial proceedings involving the Defendant and the other co-defendants, there was extensive publicity. Most of the prospective jurors had heard or read something about the "Rocky Top Murders" when the killings occurred, but their exposure was not excessive. The record demonstrates that the trial court seated only jurors who had no or limited pretrial exposure to the case or who said they could disregard pretrial information and return a verdict based exclusively upon the evidence. The record discloses no undue excitement or any other reason why a change of venue would be required pursuant to Tenn.R.Crim.P. 21 or under the standards of *State v. Hoover*, 594 S.W.2d 743 (Tenn. Crim.App.1979). The Defendant has failed to demonstrate that the trial court abused its discretion in refusing to change venue. *State v. Melson*, 638 S.W.2d 342, 360–361 (Tenn.1982).

■ The Defendant further argues that if the circumstances justified a change of venue for co-defendant Kimberly Pelley, then he was also entitled to a change of venue. Three weeks after the completion of the Harris trial, the trial court granted the motion for change of venue for Kimberly Pelley. The circumstances had in fact changed in that the Harris case itself had received extensive publicity. The trial court determined, because of the substantial trial publicity and because of the verdict in this case being reported, that Pelley could not get a fair trial in Sevier County. We find that the trial court did not abuse its discretion in refusing to change venue and that this issue is without merit.

## JURY SELECTION

■ The Defendant next raises a series of challenges concerning the selection of jurors predicated upon the Sixth and Fourteenth Amendments of the U.S. Constitution. First, the assertion is made that the trial court erred by excusing for cause

fourteen potential jurors who expressed concern about imposing death as a penalty, without providing the Defendant with an opportunity to rehabilitate each juror. The trial judge conducted all voir dire touching upon the juror's views concerning the death penalty and foreclosed any rehabilitation by the defense. Of the fourteen prospective jurors whose excusals are challenged, one, Tommy Walker, was excused with the consent of all the parties and the Defendant did not object. Another, Janet Regan, was excused because she could not set aside her opinion about the case, and another, Elsie Hampton, because of her inability to be impartial since she herself was a motel desk clerk in the area of the murders and had read several news accounts about the case. The remaining eleven prospective jurors clearly and unequivocally stated in one form or another that they could not consider the death penalty as a potential punishment. All acknowledged that under no circumstances would they consider imposing the death penalty. A typical response expressed to the trial court was, "I couldn't vote for it. No way."

■ We find the trial court committed no error in the present case. The responses of the prospective jurors revealed that their views on the death penalty would prevent or substantially impair the performance of their duties as jurors in accordance with their instructions and their oaths. This met the standard of *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), and *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). We are also mindful that the trial court's finding on this issue is to be accorded a presumption of correctness inasmuch as such findings involve a determination of demeanor and credibility particularly within the trial court's province and that the burden rests on the Defendant to establish by convincing evidence that the court's determination was erroneous. *State v. Alley*, 776 S.W.2d 506, 518 (Tenn.1989). The Defendant has failed to meet this burden. Moreover, the Defendant's failure to object to the dismissal of juror Walker waives

appellate review as to this particular juror. *State v. Harries*, 657 S.W.2d 414, 420 (Tenn.1983).

As to the rehabilitation question, we hold that there is no error in refusing to allow a Defendant to rehabilitate a prospective juror who has repeatedly and unequivocally indicated that he or she would automatically vote against the death penalty so that there is no leeway for rehabilitation. *State v. Alley*, 776 S.W.2d at 517–18; *State v. Strouth*, 620 S.W.2d 467, 471 (Tenn. 1981). The scope and extent of voir dire is entrusted to the discretion of the trial judge, and his actions will not be disturbed unless clear abuse of discretion is shown. *State v. Irick*, 762 S.W.2d 121, 125 (Tenn. 1988); *State v. Poe*, 755 S.W.2d 41, 45 (Tenn.1988). No abuse of discretion has been established in this case, particularly given the fact that the challenged jurors clearly indicated that they would not consider the death penalty under any circumstances. We are persuaded this meets the standard of our prior decisions in *Alley* and *Strouth, supra.*

The Defendant also complains that the trial court erred by not excusing for cause jurors Harrell and Strange until after the close of the Defendant's proof and further erred by not allowing him additional peremptory challenges in order to excuse Harrell because he, Harrell, had previously employed one of the experts that testified for the State in a prior civil matter. The Defendant had exhausted all of his peremptory challenges before the jury was selected.

The Defendant's challenges to these two jurors are moot because both were excused by the trial court before the jury retired to deliberate and thus the Defendant was not forced to accept an incompetent juror. *Ross v. Oklahoma*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988); *State v. Thompson*, 768 S.W.2d 239, 246 (Tenn. 1989). In any event, juror Harrell made clear that he could disregard anything he had previously learned about the case and would not give the expert's testimony greater weight than he would any other expert. Juror Strange stated that, although his aunt had been killed in a bank robbery eleven years earlier when he was thirteen years old, the event would not influence his judgment in this case. While the Defendant suggests that he was prejudiced because Harrell and Strange may have discussed the case with fellow jurors, the jury is presumed to have followed the court's instruction not to discuss the case among themselves until formal deliberations began. *State v. Blackmon*, 701 S.W.2d 228, 233 (Tenn.Cr.App.1985); *State v. Rice*, 638 S.W.2d 424, 427 (Tenn.Cr.App. 1982). Defendant's assertion of prejudice is entirely speculative since there is no suggestion that Harrell and Strange actually spoke with fellow jurors about the case. Certainly there is no indication that any juror who participated in deliberations and actually decided the case was incompetent. *See State v. Thompson*, 768 S.W.2d at 246.

The Defendant further maintains that the trial court erred by failing to conduct individual voir dire of all prospective jurors. The Defendant had filed a motion requesting that the trial court grant individual voir dire of potential jurors because of the extensive publicity, strong public sentiment, and great notoriety of the case. When the motion was presented to the trial court, the Defendant relied exclusively upon pre-trial publicity. The Defendant now argues that individual voir dire should have been granted on the jurors' views concerning the death penalty.

Individual voir dire is mandated only when there is a "significant possibility" that a juror has been exposed to potentially prejudicial material. *State v. Porterfield*, 746 S.W.2d 441, 447 (Tenn.1988). Voir dire on the prospective jurors' exposure to publicity was conducted individually just as the Defendant had requested. There is no indication of prejudice as a result of group voir dire on the prospective jurors' ability to consider the death penalty. *See State v. Workman*, 667 S.W.2d 44, 50 (Tenn.1984). Moreover, the defendant should not be allowed to rely upon one ground at trial and then assert different grounds in subsequent proceedings on appeal. *See State v. Miller*, 668 S.W.2d 281,

285 (Tenn.1984); Tenn.R.App.P. 36(a) (relief does not have to "be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.") This issue is without merit.

The final challenge to the jury selection process centers on the failure to provide a jury list containing all the information required by Tenn.R.Crim.P. 24(g) (name, address, occupation, name and occupation of spouse, and previous service on a criminal court jury). The parties had received a list of names of prospective jurors and the jurors' city of residence. When the Defendant complained of the adequacy of this information, the trial court noted that the parties could examine jurors regarding this information on voir dire and that neither party had received an advantage by the deficiency. Noncompliance with Rule 24(g) was necessitated because a special venire had been called for the trial and the court and its officers did not know who the prospective jurors would be.

The failure to provide trial counsel with a list of prospective jurors does not constitute a basis for reversal unless the defendant establishes prejudice. *See State v. Simon*, 635 S.W.2d 498, 506 (Tenn.1982). The Defendant complains that this error handicapped counsel by denying an opportunity to make a general evaluation of prospective jurors prior to jury selection. We are persuaded that, since the trial court permitted counsel to ask each prospective juror for the missing information during voir dire and the parties were equally impaired. This issue is without merit. Simply put, there has been no demonstration of prejudice, which our prior decisions have implied is necessary when there have been irregularities in the trial court's compliance with Rule 24(g). *See State v. Simon*, 635 S.W.2d at 506; *State v. Strouth*, 620 S.W.2d at 470–71.

## ALLEGED JUDICIAL MISCONDUCT

The Defendant contends that the trial court's conduct throughout the trial constituted judicial misconduct of such a magnitude as to deny him his due process right to a fair trial. The Defendant asserts that he was denied a fair trial by the various comments and interjections by the trial judge. He points to several incidents which he says cumulatively support his charges of judicial bias. Defendant also cites several comments made by the trial court, several of the court's rulings, and the court's restrictions on Defendant's cross-examination of witnesses as indicating the court's bias against him.

It is clear that a trial judge should not express any thought that would lead the jury to infer that his opinion was in favor of or against a defendant in a criminal trial. *Brooks v. State*, 187 Tenn. 67, 213 S.W.2d 7, 10 (1948). The potentially prejudicial comments made by the court, however, were made to counsel at bench conferences out of the hearing of the jury or during proceedings in which the jury had been removed from the courtroom and could not have prejudiced Defendant, even if they had reflected a bias against the Defendant, which they did not. The various rulings of the trial court on the admissibility of evidence and the propriety of cross-examination and argument were only an exercise of the discretion accorded to the trial court in conducting the trial. *See e.g., Hamilton v. State*, 555 S.W.2d 724, 728 (Tenn.Crim.App.1977); *Pique v. State*, 480 S.W.2d 546, 548 (Tenn.Crim.App.1972).

An examination of the entire record establishes that the trial court did not conduct the trial in a manner showing bias in favor of the State. The trial court directed the prosecutor, *sua sponte*, to avoid leading questions, and he admonished the prosecutor to avoid unnecessary questions. Comments and interjections were made on behalf of the Defendant as well as the State. Review of these incidents, and indeed of the entire record, shows no bias against the Defendant.

Defendant also alleges that the trial court's opening remarks to the jury panel left an improper implication with the jury about the Defendant's failure to testify and the burden of proof. During his

opening remarks to the jury panel before the beginning of voir dire, the court informed the prospective jurors that the Defendant might or might not testify, but that, if the State failed to prove its case, then the Defendant did not have to do anything. Defendant avers that these remarks compelled the Defendant to testify and unconstitutionally commented on the Defendant's right not to testify. In his remarks, the Court made it clear that the Defendant was presumed innocent and that his failure to testify could not be considered "for any purpose whatsoever." At no point did the court suggest that guilt could be inferred from Defendant's silence or that the burden of proof lay upon him. At the close of the guilt phase, the court correctly instructed the jury regarding the presumption of innocence and admonished the jury that the Defendant's failure to testify could not be considered as an admission of guilt. We find no reversible error.

## EXPERT WITNESSES

The Defendant avers that the trial court erred in refusing to order the State to pay the expenses of an independent handwriting expert. He further complains that the trial court erred in refusing to require the presence of the FBI laboratory technician who tested samples of hair found at the scene of the murders.

 A key piece of evidence in this case was the "Maggie Valley letter." On the first day of trial, there occurred an in-chambers discussion of the various legal problems raised by the need for testimony concerning the handwriting in the Maggie Valley letter. Upon hearing that the State was prepared to offer the testimony of Antonia Jones and Thomas Vastrick, an expert in questioned documents, the Defendant requested an opportunity to have an independent expert examine the letter and the Defendant's handwriting. The court denied the request because it came too late.

The Defendant contends that the court's refusal to provide an independent handwriting expert violated his rights to compulsory process, to due process, to effective assistance of counsel, and to equal protection of the law. He relies upon the general principles espoused in *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), in which the United States Supreme Court specifically held that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the Defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation and presentation of the defense. In addition to *Ake,* T.C.A. § 40–14–207(b) allows the trial court in a capital case to authorize at its discretion payment for investigative or expert services necessary to insure the proper protection of the defendant's constitutional rights.

It is clear from the record that from at least late February 1988, three months before trial, the defendant knew that the State was seeking handwriting samples and was consulting an expert. The Defendant was aware of Vastrick's testimony and the significance of the handwriting issue. When the court ordered additional samples, the Defendant refused to comply. The trial court allowed the Defendant to send copies of the Maggie Valley letter and Silvers' handwriting to James Kelly, a handwriting expert with the Georgia Bureau of Investigation. The court did not foreclose granting expenses for Kelly to testify. Neither the State nor the court ever led the Defendant to believe that Vastrick would not testify. Other than the request for Kelly to testify and to examine his co-defendant's handwriting, the record does not show that the Defendant ever made a specific request for an independent handwriting analysis before trial began. Under these circumstances, the trial court did not abuse its discretion.

 At a pre-trial hearing on April 11, 1988, the Defendant requested that the author of the FBI hair and fiber report be subpoenaed to testify. The court granted the request pending a showing of relevancy and materiality of the testimony. When it appeared that problems were arising with scheduling the testimony of the FBI agent,

the court, upon the State's agreement to stipulate to all the information contained in the report, ordered the parties to stipulate the contents of the report. A defendant seeking to secure the presence of an out-of-state witness must demonstrate that the witness will offer material testimony. T.C.A. § 40–17–207; *State v. Workman*, 667 S.W.2d 44, 49 (Tenn.1984). Since the necessary proof was developed by stipulation, the Defendant failed to meet his burden of showing materiality. Portions of the report were read into evidence at trial, and the jury was instructed to treat the stipulated information the same as if the agent had testified. Since the necessary, material and competent proof sought to be established by the witness (i.e., that a Negro hair was found on Valentine) was established by the stipulation, there is no reversible error in failing to subpoena the agent to testify in person.

## ALLEGED ERRORS AT TRIAL

### OPENING STATEMENT

■ The Defendant alleges that the trial court abused its discretion by refusing to allow him to reserve his opening statement until the beginning of the defense proof. He cites two cases from the D.C. Court of Appeals and two cases from Texas for the proposition that a defendant should be allowed the right to withhold making an opening statement until the close of the government's case. In Tennessee, this is covered by statute. T.C.A. § 20–9–301 grants a criminal defendant the right to make an opening statement "prior to the presentation of any evidence in the case." A criminal defendant in Tennessee has no right to make an opening statement at any other time, and the court here did not abuse its discretion in refusing the request. *See State v. Cadle*, 634 S.W.2d 623, 626 (Tenn.Crim.App.1982); *see also State v. Strange*, 772 S.W.2d 440, 441 (Tenn.Crim. App.1989).

■ The Defendant next contends that the trial court improperly restricted his opening statement. During defense counsel's opening statement, the trial court interrupted and told counsel "not to philoso-phize" or argue but to tell "what you expect this proof to show." Counsel responded, "[T]here are some things that I need to comment on that the State has said...." The court then stated, "[T]his is a chance to make an opening statement ... this is not argument. Ample time will be afforded [that]."

As previously stated, the defendant is entitled to make an opening statement setting forth his respective contentions, views of the facts, and theories of the lawsuit. T.C.A. § 20–9–301. In the instant case, however, the Defendant's attorney injected argument into the opening statement. The defendant's attorney stated that he needed to comment upon the opening statement of the prosecutor. While the trial court's interruption may have been premature, defense counsel seems to have been allowed to make his point (i.e., the proof would show no physical evidence linking the Defendant to the killings). We find no reversible error.

■ The Defendant asserts that the trial court erred in denying his request to apply the rule of sequestration to all witnesses prior to the opening statements in order to prevent their prejudice or bias by hearing the State's theory before testifying. The rule was put into effect before the State began its proof. The purpose of the rule is to prevent one witness from hearing the testimony of another and adjusting his testimony accordingly. *Smith v. State*, 554 S.W.2d 648, 651 (Tenn.Crim. App.1977).

■ Placing witnesses under the rule or exempting them is within the sound discretion of the trial court. *State v. Taylor*, 645 S.W.2d 759 (Tenn.Crim.App.1982). The question of whether the rule must be applied upon request before opening statements was unsettled in Tennessee at the time of this trial. *See* 10 Raybin, *Tennessee Practice*, § 26.21 (1985). Rule 615, Tennessee Rules of Evidence (effective date January 1, 1990), requires that upon request, sequestration of witnesses shall be effective before opening statements.

The prosecution's opening statement in this case described the facts the State would prove; that of the defense pointed out the weaknesses in the State's case. The Defendant does not designate, and the record does not clearly show, which witnesses, if any, were present during opening statement. For example, Joseph DeModica was in custody awaiting his own trial at the time of this trial. DeModica and Tim Farmer were sworn just before they testified, which indicates that these crucial witnesses were not present during opening statements. The Defendant has failed to establish prejudice, and we find no reversible error.

## ADMISSIBILITY OF LAY AND EXPERT TESTIMONY

■ The Defendant avers that the testimony of Antonia Jones and Johnnie Shultz should have been excluded because their names were not given to the Defendant as part of discovery, nor were they listed on the indictment as required under T.C.A. § 40–17–106. Section 40–17–106 is directory only and does not necessarily disqualify a witness whose name does not appear on the indictment from testifying. *State v. Street,* 768 S.W.2d 703, 710–711 (Tenn.Crim.App.1988). Rule 16, Tenn. R.Crim.P., does not require nor authorize pretrial discovery of the names and addresses of the State's witnesses. *State v. Martin,* 634 S.W.2d 639, 643 (Tenn.Crim. App.1982). The State, however, did supply lists of the names of its witnesses to the Defendant in this case.

Antonia Jones is, as previously noted, the Defendant's former girlfriend, who identified his handwriting as that in the Maggie Valley letter. There is no proof that the State hid Jones' existence from the Defendant, as the Defendant implies in his brief. It is clear that the State and law enforcement authorities first learned of Jones' ability to identify the Defendant's handwriting four days before the trial began and that the State immediately notified defense counsel of Jones and her prospective testimony. Defense counsel was able to investigate and to interview the witness's mother in advance of trial. The trial court authorized the expenses necessary to secure the presence of Antonia Jones' mother, an out-of-state witness. Jones was subject to thorough cross-examination, and her mother, Julia Jones, testified for the defense in an attempt to discredit her daughter's testimony. No prejudice, bad faith, or undue advantage has been shown requiring relief on this issue. *See State v. Baker,* 751 S.W.2d 154, 164 (Tenn.Crim.App.1987); *State v. Craft,* 743 S.W.2d 203 (Tenn.Crim. App.1987).

The Defendant also argues that the State was late in providing discovery of the witness Johnnie Shultz. The Defendant has neither briefed on appeal nor challenged at trial the testimony of Shultz on these grounds. Shultz was DeModica's acquaintance, to whom the group attempted to sell the fur coat stolen from Tim Farmer. We find no plain error in the admission of her testimony.

■ The Defendant next contends the trial court erred in allowing Thomas Vastrick to testify as an expert because he could not conclusively state that Defendant was the writer of the Maggie Valley letter. The admissibility of expert testimony, the qualification of expert witnesses, and the relevancy and competency of expert testimony are matters which rest within the sound discretion of the trial court. *Arterburn v. State,* 216 Tenn. 240, 391 S.W.2d 648, 655 (1965); *State v. Holcomb,* 643 S.W.2d 336, 341 (Tenn.Crim.App.1982). Such testimony is often more or less speculative. *See Edwards v. State,* 540 S.W.2d 641, 647 (Tenn.1976). Although Vastrick could not offer a conclusive opinion regarding the author of the Maggie Valley letter, his testimony was admissible because it assisted the trier of fact. *State v. Purkey,* 689 S.W.2d 196 (Tenn.Crim.App.1984). The letter contained information which only a participant in the homicide would know. Of the four defendants charged with these murders, the witness was able to exclude Pelley, DeModica and Silvers as authors of the note. The substance of Vastrick's testimony was that there were enough similarities between the Defendant's handwriting

and that in the letter to indicate that the writers were the same persons. Vastrick used charts to illustrate these similarities to the jury.

The conclusions reached by Vastrick are quite similar to those reached by experts in hair and fiber analysis, which are admissible in criminal cases; and his inability "positively" to identify Defendant as the writer of the Maggie Valley letter should not prohibit the admission of his testimony. *Brady v. State,* 584 S.W.2d 245, 250 (Tenn. Crim.App.1979).

■ In connection with this issue, the Defendant also argues that the trial court inadequately charged the jury regarding expert testimony. The court's instruction, essentially that of T.P.I.—Crim. § 37.13 (2d ed. 1988), was not erroneous. This instruction properly directed the jury to evaluate the proof carefully and with caution. Without question, this charge guided the jury in properly considering the less than conclusive nature of the expert's handwriting identification. The Defendant's assertion that the trial court should have commented upon the witness's uncertainty would have invaded the jury's duty to weigh the evidence and evaluate the credibility of this witness. *Byrge v. State,* 575 S.W.2d 292, 295 (Tenn.Crim.App.1978).

■ The Defendant asserts the trial court erred in refusing to allow Julia Jones to express her opinion on whether the Defendant wrote the Maggie Valley letter. The Defendant sought to elicit the opinion of Julia Jones, mother of Antonia Jones, as to whether the writing in the Maggie Valley letter was the Defendant's. A jury-out hearing was held at which Jones testified that, although she had seen the Defendant write his signature approximately three times about three and a half years before, she had never seen him write a sentence. Jones stated, "I am not a handwriting expert. And if four handwriting experts can't do it, I'm not qualified." She also stated she could recognize Defendant's signature but "that would be it." The trial court refused to allow Jones to give her opinion on this issue although the court stated Jones would be allowed to testify as

to her knowledge of Defendant's ability to write.

■ To be competent to give opinion evidence as to the identity of the maker of an exhibited handwriting, a witness must be familiar with the signature and handwriting of an individual by experience. The competency of the witness is a matter for the trial judge's discretion. *State v. Chance,* 778 S.W.2d 457, 461 (Tenn.Crim. App.1989); *State v. Chestnut,* 643 S.W.2d 343, 347 (Tenn.Crim.App.1982). There was no abuse of discretion in refusing to allow Jones to offer opinion testimony.

The Defendant avers that the trial court erred in allowing evidence of his refusal to supply additional handwriting exemplars and in allowing the jury to draw an adverse inference from the refusal. The proof shows that, after giving some handwriting samples, in defiance of a court order, the Defendant refused to give additional samples when Vastrick requested more examples of lower-case letters written by the Defendant. Evidence of this refusal came before the jury and the court charged the jury as follows:

"Evidence that Court-ordered additional handwriting samples, were not provided as ordered, may raise an inference, that the additional samples if provided would prove adverse to him. Whether the inference is drawn, is for your judgment. And what value it may have is likewise for your judgment. You will look to any explanation given or any explanation apparent in the proof, which otherwise explains the refusal, which would make an inference inappropriate. Whether an inference should be drawn, and what value if any it may have is for your judgment."

■ The Defendant argues that use of this evidence violates his Fifth Amendment right against self-incrimination. That right, however, is not violated by requiring a defendant to provide handwriting samples for comparison with other evidence, *see Gilbert v. California,* 388 U.S. 263, 265, 87 S.Ct. 1951, 1953, 18 L.Ed.2d 1178 (1967), nor does the introduction of evidence that a defendant refused to take a

legally required test violate the right against self-incrimination. *South Dakota v. Neville*, 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983); *cf. State v. Morgan*, 692 S.W.2d 428, 430 (Tenn.Crim.App.1985); *State v. Smith*, 681 S.W.2d 569, 570 (Tenn. Crim.App.1984). Contrary to the Defendant's argument, the failure to warn the Defendant that his refusal could be used against him at trial does not violate the Due Process Clause. *South Dakota v. Neville*, 459 U.S. at 564–67, 103 S.Ct. at 923–924. The Defendant asserts that use of the evidence violates his Sixth Amendment right to counsel, but the record shows that his attorney was present when he was asked to give samples. Any indication by an accused of a desire to evade prosecution may be shown as one of a series of circumstances from which guilt may be inferred. *Marable v. State*, 203 Tenn. 440, 313 S.W.2d 451, 459 (1958).

■ The Defendant also challenges as unconstitutional the court's charge regarding the inference to be drawn from his refusal to give handwriting samples. The Defendant says that the instruction shifted the burden of proof contrary to the rule of *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). There is no merit to this argument because the instruction, which clearly charged the jury that any inference was permissive and rebuttable, did not relieve the State of proving an element of the offense in violation of *Sandstrom*. *See State v. Bolin*, 678 S.W.2d 40, 44–45 (Tenn.1984).

■ The Defendant next alleges that the testimony of Tim Farmer about statements which the Defendant made the night before the murders was improperly admitted into evidence. Farmer was allowed to testify that, on the night before the murders, the Defendant talked about a friend of his who liked to get people high, handcuff them to trees and do obscene things to them "like in an execution style." Farmer also testified that he saw handcuffs similar to those found at the scene of the murders in the Defendant's car and that the Defendant and his companions were planning to return to Gatlinburg on the day of the murders.

■ Evidence is relevant when it has a tendency to make the existence of any fact that is of consequence to the action more probable or less probable than it would be without the evidence. *State v. Banks*, 564 S.W.2d 947, 949 (Tenn.1978). The proof established that a handcuff was attached to Valentine's left wrist. Four heavy bruises on Mrs. Hill's left wrist was consistent with hard yanking on handcuffs. This proof established that Hill was handcuffed and struggled to free herself before she was murdered. The proof further established that Hill suffered numerous superficial wounds in addition to the major wounds which caused her death. This evidence of torture during the course of the murder of Hill is consistent with the Defendant's apparent fascination with the activities of his friend.

■ The similarities between the Defendant's statement on September 12 and of the murders on September 13 tend to establish his identity as the perpetrator of the instant crimes. This evidence was also admissible to corroborate the testimony of Joseph DeModica, who testified that he last saw the Defendant's handcuffs just before the murders. These statements meet the test of relevancy as set forth above. *Banks*, 564 S.W.2d at 949. Although the Defendant complains that the statements were not given with any direct correlation to the instant crimes, the proof is otherwise. Declarations of the Defendant made prior to the crime, which indicate an intent to engage in the criminal conduct are relevant and admissible. When such a declaration is merely general in character or has no apparent relation to the homicide that follows, it is irrelevant. 1 *Wharton's Criminal Evidence*, § 139 (14th ed. 1985). The statements of the Defendant on the evening preceding the murders corresponded with the manner in which the victims were killed and are relevant to show Defendant's involvement in the murders. *See State v. Jones*, 789 S.W.2d 545, 551 (Tenn.1990).

The Defendant next contends that error occurred in the admission of evidence that a few days before the killings defendant and DeModica stole credit cards and jewelry from one of Tracey Clark's neighbors and that on the day of the murders the two men took clothing and a radio from Tim Farmer's apartment. Evidence of another crime is admissible at a criminal trial when the crime is relevant to some matter actually at issue in the case on trial and its probative value is not outweighed by its prejudicial effect. *Bunch v. State,* 605 S.W.2d 227, 229 (Tenn.1980). The State successfully argued at trial that evidence of these crimes was relevant to corroborate DeModica's testimony by showing his association with the Defendant immediately prior to the murders. While evidence of the commission of these crimes by the Defendant and DeModica was unnecessary to establish that the Defendant was in DeModica's company and in the area at the time of the murders, such proof was not extensive or emphasized at either the guilt or sentencing hearing. The trial court gave a thorough and comprehensive instruction regarding this proof in which the court explicitly delineated the point on which it was relevant and charged the jury to consider this evidence of other offenses only for the limited purpose for which it was introduced. This Court must assume that the jury followed the trial court's instructions. *State v. Lawson,* 695 S.W.2d 202, 204 (Tenn.Crim.App.1985). We further find that the proof of other crimes added no "new dimension to the jurors' view of defendant" at either the guilt phase or sentencing hearing. *See State v. Carter,* 714 S.W.2d 241, 247–248 (Tenn. 1986). Aside from the issue of the credibility of DeModica's testimony, which has been accredited by the jury and adequately corroborated, the proof of the Defendant's guilt is overwhelming. The challenged evidence, which indicated that Defendant and DeModica had been equal partners in two minor, nonviolent thefts, is insignificant in light of other unchallenged testimony at the guilt phase, for example, that the Defendant went armed with two knives and described someone who liked to handcuff and torture people, and undisputed evidence at the sentencing phase, directly relevant to aggravating circumstances, that Defendant had previously been convicted of rape, aggravated sodomy and armed robbery. In the context of the entire record in this case, therefore, we find that error in the admission of this evidence was not only harmless under T.R.A.P. 36(b), but harmless beyond a reasonable doubt. *See State v. Carter,* 714 S.W.2d at 246–247 (irrelevant evidence that Defendant changed the vehicle identification number on automobile was clearly harmless error beyond a reasonable doubt).

The Defendant next asserts that the trial court erred in limiting his cross-examination of Farmer and DeModica. The propriety, scope, manner and control of examination of witnesses is within the trial court's discretion and will not be interfered with in the absence of an abuse of discretion. *Edwards v. State,* 221 Tenn. 60, 424 S.W.2d 783, 786 (1968); *State v. Elliott,* 703 S.W.2d 171, 176 (Tenn.Crim. App.1985). The trial court restricted questions which were repetitious and argumentative. The record reflects that the trial court did not prohibit the Defendant from cross-examining Farmer or DeModica regarding any relevant material.

The Defendant next avers that co-defendant Silvers should have been required to exercise his Fifth Amendment privilege against self-incrimination in the presence of the jury. Silvers's attorney moved to quash the subpoena for his client, who had not yet been tried, and asserted Silvers' Fifth Amendment privilege not to testify. The trial court declined the Defendant's request. It is not error to refuse to force a witness to take the stand to claim his Fifth Amendment privilege in front of a jury, nor may a jury draw inferences from the decision of a witness to exercise his constitutional privilege against self-incrimination. *State v. Dicks,* 615 S.W.2d 126, 128–129 (Tenn.1981). In *Dicks,* the trial court refused to force the co-defendant, whose conviction and sentence of death were on appeal, to exercise his right against self-incrimination in the presence of

the jury. Since co-defendant Silvers had not yet been tried, the trial court properly granted the motion to quash the subpoena. *See also State v. Burns,* 777 S.W.2d 355, 359 (Tenn.Crim.App.1989).

## PHOTOGRAPHS

The Defendant next complains that two photographs from the scene of the murders lacked probative value, were prejudicial, and should not have been admitted. The admitted photographs showed the position of Valentine's flashlight on a chair and the handcuffs attached to Valentine's left wrist. Neither of these photographs is gruesome or inflammatory. The decision to admit the photographs lies in the discretion of the trial court and will not be reversed absent a clear showing of an abuse of that discretion. *State v. Allen,* 692 S.W.2d 651 (Tenn.Crim.App.1985).

The photographs were introduced to show the position of the flashlight and the handcuffs at the scene. This corroborates DeModica's testimony that Valentine was clubbed unconscious with his flashlight and that the handcuffs in the car disappeared while the parties were at the motel. The State asserts the fact that Valentine was clubbed unconscious and handcuffed before he was stabbed and shot proves malice, intent and premeditation. The horrible injuries suffered by each victim are not visible in either photograph. The probative value of these photographs outweighs any prejudicial effect. *See State v. Banks,* 564 S.W.2d 947 (Tenn.1978).

Defendant also contends that a photograph of a chair at the crime scene should not have been admitted because the State failed to provide it to defense counsel during discovery. When defense counsel claimed that he had not previously seen the photograph, the State responded that the photograph was included in a package of photos shown to counsel. The trial court's resolution of this factual dispute has the weight of a jury verdict and should be affirmed. *State v. Morton,* 639 S.W.2d 666, 668 (Tenn.Crim.App.1982).

## JURY CHARGE

The Defendant next alleges that the trial court's instruction to the jury at the guilt phase regarding the prospect of a sentencing hearing upon a conviction of murder in the first degree improperly focused the jury's attention on the first degree murder count.

After charging the jury on common-law first degree murder, felony murder, and the various degrees of homicide, the trial court charged the jury that, if they found the Defendant guilty of first degree murder, it would be their duty, after a separate sentencing hearing, "to determine whether the Defendant shall be sentenced to death, or life imprisonment." *See generally* T.P.I.—Crim. §§ 20.01 and 20.02. The Defendant says this deprived him of the constitutionally mandated bifurcated trial by improperly focusing the jury's attention on the first degree murder charge and confusing the jury. We find no merit to this argument. The Defendant did not object to the charge. Indeed, he requested that the trial court charge the jury as to the range of punishment for all offenses, both principal and lesser included offenses. The jury had already been fully informed during voir dire of the sentencing procedure that would occur if the Defendant was found guilty of first degree murder. In fact, leaving the jury ignorant of this information could lead to jury confusion. *See State v. Fuino,* 608 S.W.2d 892 (Tenn.Crim. App.1980).

The Defendant avers that the trial court's instructions of common-law murder and felony murder unduly emphasize the murder count. The Defendant was indicted upon two counts each of murder in common-law form and felony murder. It is the trial court's duty to give a complete charge of the law applicable to the facts of the case. *State v. Thompson,* 519 S.W.2d 789, 792 (Tenn.1975).

The Defendant avers that the trial court erred by refusing to grant his request to instruct that the State must prove the Defendant's identity as the person who committed the crime beyond a reasonable doubt. *See* T.P.I.—Crim. § 37.17. The

**74**

court found the instruction was inapplicable because there was no question of identity or of a witness whose identification of Defendant was "shaky or questionable." We agree that there was no need for such an instruction. No evidence challenged Joseph DeModica's identification of the Defendant as the person who accompanied him on the day of the murders. The issue in this case was whether DeModica was telling the truth. The court repeatedly instructed the jury that the State must prove beyond a reasonable doubt that the Defendant was the person responsible for the victims' deaths.

■ The Defendant asserts that the trial court erred by instructing the jury as to flight. The court's charge conformed to the language used in T.P.I.—Crim. § 37.16 (2d ed. 1988). The Defendant points out that the propriety of a flight instruction has been criticized in numerous jurisdictions and cites nine states which have held that the elements of flight are more properly the subject of counsel's argument than a matter of instruction by the court to the jury. Tennessee law allows instructions as to the inference to be drawn from a defendant's flight. *Hill v. State*, 3 Tenn.Crim. App. 331, 334–335, 461 S.W.2d 50, 52 (1970). There is evidence in this case to support such an instruction. *See, e.g., State v. Rhoden*, 739 S.W.2d 6, 15–16 (Tenn.Crim.App.1987); *State v. Stafford*, 670 S.W.2d 243, 246 (Tenn.Crim.App.1984); *Rogers v. State*, 2 Tenn.Crim.App. 491, 501–502, 455 S.W.2d 182, 186–187 (1970).

■ The Defendant next alleges that the instructions given by the trial court on the various degrees of homicide fail to conform to the pattern jury instructions. The trial court's instructions regarding common law murder in the first degree and felony murder conform to the pattern instructions. T.P.I.—Crim. §§ 20.01 and 20.02. The manslaughter and second degree murder instructions do not conform exactly to the pattern instructions; however, the trial court did state the applicable law as to each offense. Since the jury convicted the Defendant of murder in the first degree and

felony murder, any error would have been harmless.

■ The Defendant also avers that nonuse of a mandatory pattern instruction, when applicable to the facts of a given case, is error. We wish to point out that, although we recommend their use, the pattern instructions are not mandatory but merely suggestions, and a trial court is not required to use them in instructing a jury. *State v. Martin*, 702 S.W.2d 560, 564, n. 5 (Tenn.1985).

## SENTENCING

The Defendant avers that the trial court's charge regarding mitigating circumstances unconstitutionally failed to inform the jury what weight, if any, is to be placed upon the finding of mitigating circumstances and conveyed an impression that jurors must unanimously agree on the existence of mitigating circumstances. The trial court's instructions to the jury conform to the language and structure of the Tennessee Death Penalty Statute. This Court has held that jury instructions which conform to the language and structure of the Death Penalty Statute do not require the jury to agree unanimously upon the existence of any mitigating circumstance. *State v. Thompson*, 768 S.W.2d 239, 252 (Tenn.1989); *cf. Walton v. Arizona*, 497 U.S. 639, 650, 110 S.Ct. 3047, 3055, 111 L.Ed.2d 511, 515 (1990). For this reason, the trial court's instruction did not violate the standards of *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

■ Contrary to Defendant's assertion, the trial court's instructions did not lead the jury to believe that all must agree upon a mitigating circumstance before it could be considered. Under the instructions, the jury first determined the aggravating circumstances beyond a reasonable doubt. Each juror was then free to consider any relevant mitigating circumstance and impose a lesser sentence. Unlike *Mills*, where the jury was instructed to affirmatively agree upon the existence of mitigating circumstances, the Tennessee statute requires the jury to agree only upon the

absence of any mitigating factors sufficiently substantial to outweigh the aggravating circumstances. This negative finding permits each juror to consider any mitigating circumstance which he or she feels is raised by the evidence. The instruction did not require agreement on mitigating factors.

 The Defendant also alleges that the "anti-sympathy" instruction given by the court at sentencing unconstitutionally limited the sentencer's consideration of mitigating circumstances. There is no merit to this argument. *See California v. Brown*, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987); *State v. Porterfield*, 746 S.W.2d 441 (Tenn.1988); *see also Saffle v. Parks*, 494 U.S. 484, 491–95, 110 S.Ct. 1257, 1262–1263, 108 L.Ed.2d 415 (1990). The Defendant is entitled to have the jury consider all statutory and non-statutory mitigating circumstance which are raised by the evidence. *State v. Hartman*, 703 S.W.2d 106, 108 (Tenn.1985). The trial court properly instructed the jury that its consideration of mitigating circumstances was not limited to those factors enumerated by the statute. The jury must not be precluded from considering during sentencing as a mitigating factor any aspect of a defendant's character or record or any circumstance of the offense that the defendant proffers as a basis for a sentence less than death. *Lockett v. Ohio*, 438 U.S. 586, 602–06, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978). The Defendant also argues that the instructions, which mirrored the statute, created a mandatory death penalty. There is no merit to this contention. *See Walton v. Arizona*, 497 U.S. at 651, 110 S.Ct. at 3056; *Blystone v. Pennsylvania*, 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990); *Boyde v. California*, 494 U.S. 370, 374–78, 110 S.Ct. 1190, 1195–1196, 108 L.Ed.2d 316 (1990).

## SUFFICIENCY OF THE EVIDENCE

 The Defendant next asserts that the evidence was insufficient to support his conviction. It is well established that a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn.1983); *State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn.1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 836 (Tenn.1978). Moreover, a verdict against the Defendant removes the presumption of innocence and raises the presumption of guilt on appeal, *see State v. Grace*, 493 S.W.2d 474, 476 (Tenn.1973) and *Anglin v. State*, 553 S.W.2d 616, 620 (Tenn. Crim.App.1977), which the Defendant has the burden of overcoming. *State v. Brown*, 551 S.W.2d 329, 331 (Tenn.1977). Where the sufficiency of the convicting evidence is challenged, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found Defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Duncan*, 698 S.W.2d 63 (Tenn.1985); T.R.A.P. 13(e).

Joseph DeModica testified that the Defendant and Pelley took Melissa Hill into the motel room where her body was subsequently discovered. The Defendant and Pelley fought with Troy Valentine, clubbed him unconscious and dragged him into the room. DeModica heard two gunshots inside the room. He testified that when the Defendant and Pelley came out of the motel room they looked as though someone had sprayed them with red paint. The massive amount of blood and the number of injuries inflicted upon each victim corroborated this statement. DeModica knew that Valentine had been clubbed with his flashlight. This information was not released to the media and would have been known only to the killers.

Substantial evidence corroborated DeModica's testimony that the Defendant was implicated in this crime. *State v. Henley*, 774 S.W.2d 908, 913 (Tenn.1989). Each victim suffered a deep neck wound from a serrated knife. Each victim had been shot

in the head. Tim Farmer testified that the Defendant carried a lock-blade knife and a hunting knife with a serrated edge. Further, on the day of the murders, Defendant and his companions left for Gatlinburg with no money.

Following his arrest, the Defendant first denied going to Gatlinburg or going to Knoxville with DeModica and Silvers. He subsequently stated that he and his companions had eaten in a restaurant in Pigeon Forge and that he had purchased a chain for Pelley while they were in Gatlinburg with DeModica and Silvers.

The Maggie Valley letter, which was found three days after the murders, contained information which only the killers would have known. Expert testimony excluded Pelley, DeModica and Silvers as the authors of the letter. Expert testimony further established strong indications that the Defendant wrote this letter. Antonia Jones, who was familiar with the Defendant's handwriting and writing ability, identified the Defendant's handwriting on the Maggie Valley letter.

The Defendant is asking this Court to reweigh the evidence and invade the jury's responsibility to evaluate the credibility of the witnesses. *State v. Adkins,* 786 S.W.2d 642, 646 (Tenn.1990). Since the overwhelming evidence supported the verdict of the jury, the judgment of conviction must be affirmed.

The Defendant has not challenged the sufficiency of the evidence to support the aggravating circumstances found by the jury to warrant imposition of the death penalty in this case. Nonetheless, as in all capital cases, under the directive of T.C.A. § 39–13–206(c)(1)(B) [formerly T.C.A. § 39–2–205(c)(2)], this Court has reviewed the evidence pertaining to the aggravating circumstances and concludes that it is sufficient to support the aggravating circumstances found by the jury in this case.

The dissent challenges the validity in the present case of the aggravating circumstance found in T.C.A. § 39–2–203(i)(5), i.e., the murders were "especially heinous, atrocious, or cruel in that [they] involved torture or depravity of mind." The proof shows that the murderer handcuffed Melissa Hill and, while she was conscious and helplessly struggling against the cuffs, viciously stabbed her eighteen times, the fatal blow being a savage, sawing attack to her throat. The killer then shot Hill in the head. The murderer similarly brutally attacked Valentine; and although the security guard had been fatally shot between the eyes, the killer continued to senselessly and repeatedly stab the body. Tim Farmer testified to the Defendant's fascination with a "friend's" handcuffing and obscenely abusing persons. This testimony, coupled with the deliberate, senseless and repeated mistreatment of the victims in this case, establishes beyond a reasonable doubt that the murders were especially "heinous, atrocious, and cruel" under the requirements of the statute. *See State v. Williams,* 690 S.W.2d 517, 529 (Tenn.1985). The jury having been fully and correctly instructed on this aggravating circumstance in accord with *State v. Williams, id.,* we find no grounds for reversal. *See State v. Black,* 815 S.W.2d 166, 181 (Tenn.1991).

## CONCLUSION

In his final argument, the Defendant asserts that the Tennessee Death–Penalty Statute is unconstitutional for the reasons stated by Justice Brock in his dissenting opinion in *State v. Dicks,* 615 S.W.2d 126, 132 (1981). This position was rejected by the majority in *Dicks* and this Court has consistently upheld the constitutionality of the statute. Recently, in *State v. Black,* 815 S.W.2d 166 (Tenn.1991), a majority of this Court once again upheld the constitutionality of the Tennessee Death Penalty Statute under both the State and Federal Constitutions.

In accordance with the mandate of T.C.A. § 39–13–206(c)(1)(D) [formerly T.C.A. § 39–2–205(c)(4)], we find: that the sentence of death was not imposed in an arbitrary fashion; that the evidence supports the jury's findings of three statutory aggravating circumstances; and that the evidence supports the jury's finding of the absence of any mitigating circumstances

sufficiently substantial to outweigh the aggravating circumstances so found.

■ Our comparative proportionality review convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the Defendant. The fact that this majority opinion does not go into the detail that the dissenting judges desire in their dissenting opinion by no means indicates that we have not deliberated, studied, compared and analyzed cases, and conducted a meaningful proportionality review as outlined in *State v. Barber,* 753 S.W.2d 659, 663–668 (Tenn.1988). We have reviewed Rule 12 reports from trial judges submitted over the past fourteen years in all criminal trials for first degree murder in which life imprisonment or a sentence of death has been imposed. No two cases are alike, and no two defendants are alike. A comparative review helps us make the determination of whether the penalty imposed in the case at bar is or is not disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. *See Lockett v. Ohio,* 438 U.S. 586, 602–605, 98 S.Ct. 2954, 2963–2965, 57 L.Ed.2d 973 (1978).

■ Our 1977 statute created a comparative proportionality review to serve as an additional safeguard against arbitrary or capricious sentencing.[2] Such review of death cases insures rationality and consistency in the imposition of the death penalty. However, we must remember that "there can be 'no perfect procedure for deciding in which cases governmental authority should be used to impose death.'" *Zant v. Stevens,* 452 U.S. 862, 884, 103 S.Ct. 2733, 2747, 77 L.Ed.2d 235 (1983). A majority of this Court is of the opinion that the senseless, brutal, premeditated execu-

tion style killing of two helpless people clearly warrants the imposition of the death penalty. Melissa Hill had been shot at close range in the top left side of her head. She had been stabbed eighteen times. The fatal injury was a deep thrust wound across her neck that had cut the trachea and the neck's major blood vessels and had chipped the spinal column. Dr. Blake described the wound as "very savage." Dr. Blake opined that Melissa Hill had been stabbed before she had been shot. She had a defensive slash wound on her right palm and three superficial wounds on the back of her neck. Bruises on her wrist indicated that she had yanked her hand hard against a metal surface, such as a handcuff. The autopsy of Troy Valentine revealed several stab wounds on his chest and back and lacerations to the back of his head. He suffered a deep stab wound into the bone of the jaw and a large stab wound that went into his neck. He had a gunshot entry wound between his eyes. Death was caused by either the gunshot wound or the stab wound in his neck.

We have considered the character of the Defendant and his prior violent acts. He had been convicted in Fulton County Georgia in 1976 for rape, aggravated sodomy and armed robbery. We have also considered his role as the leader in the commission of this crime. The circumstances involved in these two violent homicides indicate to us the nature and character of this Defendant. This was one of the most chilling and brutal killings we have reviewed in the past 14 years.

In making our comparative review, a majority of this Court is of the opinion that the imposition of the death penalty by the jury was neither arbitrary nor excessive or disproportionate to the penalty imposed for similar crimes.

2. Comparative proportionality review of a death sentence by an appellate court is not constitutionally required in every case in which the death penalty is imposed and the defendant requests it. *Pulley v. Harris,* 465 U.S. 37, 50, 104 S.Ct. 871, 879, 79 L.Ed.2d 29 (1984). In *Proffitt v. Florida,* 428 U.S. 242, 259, 96 S.Ct. 2960, 2969, 49 L.Ed.2d 913 (1976), the defendant, like the dissenting opinion in this case, attacked the

appellate review process alleging that the role of the Supreme Court of Florida in reviewing death sentences is subjective and unpredictable. The United States Supreme Court responded, as we do today, that "[w]hile it may be true that that court has not chosen to formulate a rigid objective test as its standard of review for all cases, it does not follow that the appellate review process is ineffective or arbitrary."

The sentence of death will be carried out as provided by law on the tenth day of June, 1992, unless otherwise ordered by this Court or by other proper authority. Costs are adjudged against the Defendant.

O'BRIEN, J., concurs.

ANDERSON, J., concurs with separate opinion.

REID, C.J., and DAUGHTREY, J., dissent.

ANDERSON, Justice, concurring:

Because the defendant, Edward Leroy Harris, was convicted of first-degree, premeditated murder, I concur in and affirm both the finding of guilt and the sentence of death. Since Harris was also convicted of felony murder, however, I expressly reserve all questions arising under the State Constitution when the death sentence is imposed for the crime of felony murder.

REID, Chief Justice, dissenting.

I would reverse and remand for a new trial on the following bases: that the jury instruction regarding the defendant's refusal to give additional handwriting exemplars violated his privilege against self-incrimination, that the court erred in admitting evidence of other crimes committed by the defendant, and that the evidence does not support the finding of the aggravating circumstance defined in T.C.A. § 39–2–203(i)(5) (1982). I would also hold that the court failed to comply with the constitutional and statutory requirement that it establish objective criteria necessary for the performance of a meaningful proportionality review.

### SELF–INCRIMINATION

The majority holds that the defendant's constitutional right against self-incrimination was not violated by the trial court's admitting evidence of his refusal to supply additional handwriting exemplars in defiance of a court order and by instructing the jury that it may draw an adverse inference from the refusal.

The law under the federal constitution supports the holding of the majority. *See South Dakota v. Nevill*, 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983); *United States v. Euge*, 444 U.S. 707, 716, 100 S.Ct. 874, 881, 63 L.Ed.2d 141 (1980); *Gilbert v. California*, 388 U.S. 263, 263, 87 S.Ct. 1951, 1953, 18 L.Ed.2d 1178 (1967); *Schmerber v. State of California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). This interpretation of the federal constitution, however, does not foreclose examination of this issue under the Tennessee Constitution since our state constitution may afford greater protections for criminal defendants than those found in the federal constitution. *Doe v. Norris*, 751 S.W.2d 834, 838 (Tenn.1988); *Miller v. State*, 584 S.W.2d 758, 760 (Tenn.1979); *Mathis v. State*, 566 S.W.2d 285, 288 (Tenn.Crim.App. 1977). Nor does the fact that the defendant has challenged this evidence only under the Fifth Amendment foreclose review under Tennessee's equivalent constitutional provision, because plain error affecting "the substantial rights of the accused" may be noticed at any time "where necessary to do substantial justice." *State v. Ogle*, 666 S.W.2d 58, 60 (Tenn.1984); T.R.Cr.P. 52(b).

In fact, the defendant's failure to cite Tennessee's constitutional grant of the privilege against self-incrimination is understandable in light of this Court's prior statement that, despite differences in terminology, Tennessee's prohibition against self-incrimination is no broader nor different than that in the Fifth Amendment. *See Delk v. State*, 590 S.W.2d 435, 440 (Tenn. 1979). Such declarations, however, do not bind this Court to follow every interpretation or limitation placed by the federal courts upon similar provisions of the federal constitution. *See, e.g., State v. Jacumin*, 778 S.W.2d 430 (Tenn.1989). The interpretation of the rights afforded by our state constitution is a prerogative of the courts of this State unfettered by federal standards except to the extent that they establish minimum protection. *See California v. Greenwood*, 486 U.S. 35, 50, 108 S.Ct. 1625, 1630, 100 L.Ed.2d 30 (1988); *California v. Ramos*, 463 U.S. 992, 1013–1014, 103 S.Ct. 3446, 3460, 77 L.Ed.2d 1171

(1983); *Oregon v. Hass,* 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570 (1975).

Initially, the difference in language between the Fifth Amendment and Article I, § 9 should be noted. The federal constitution provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Tennessee Constitution reads, "That in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself." It is of interest that the language used in Article I, § 9 antedates that of the Fifth Amendment and is originally found in Section 8 of Virginia's Bill of Rights adopted in June 1776, from which it was carried over into the constitutions of North Carolina and Pennsylvania, models for the Tennessee Constitution of 1796. *See* Laska, "A Legal and Constitutional History of Tennessee, 1772–1972," 6 Mem.St.L.Rev. 563, 582 n. 89 (1976); Pittman, "The Colonial and Constitutional History of the Privilege against Self–Incrimination in America," 21 Va. L.Rev. 763, 787–788 (1935). The origin of Tennessee's constitutional privilege against self-incrimination is thus arguably older than and independent of the language used in the federal constitution.

While the word "evidence" found in the Tennessee Constitution and the word "witness" found in the federal constitution may in some contexts be considered synonymous, *see Delk v. State,* 590 S.W.2d at 440, "evidence" generally comprehends not only the statements of witnesses but also whatever is submitted to the judge or jury to elucidate an issue, to prove a case, or to establish or disprove a fact in issue. *People v. Leonard,* 207 Cal.App.2d 409, 24 Cal.Rptr. 597, 600 (1962); *County Treasurer v. First Nat'l Bank of Lake Forest,* 87 Ill.App.2d 133, 230 N.E.2d 571, 574 (1967); *Commonwealth v. Myers,* 393 Pa. 224, 144 A.2d 367, 370 (1958); *Crooks v. Harmon,* 29 Utah 304, 81 P. 95 (1905). However, whether this semantic distinction between the state and federal constitutions is significant need not be resolved at this time, because the meaning of the privilege against self-incrimination is found in the history and purpose of the privilege. As Justice Fortas wrote:

This great privilege is not merely a shield for the accused. It is also a prescription of technique designed to guide the State's investigation. History teaches us that self-accusation is an unreliable instrument of detection, apt to inculpate the innocent-but-weak and to enable the guilty to escape. But this is not the end of the story. The privilege historically goes to the roots of democratic and religious principle. It prevents the debasement of the citizen which would result from compelling him to "accuse" himself before the power of the state. The roots of the privilege are deeper than the rack and the screw used to extort confessions. They go to the nature of a free man and to his relationship to the state.

*United States v. Wade,* 388 U.S. 218, 261, 87 S.Ct. 1926, 1950, 18 L.Ed.2d 1149 (1967) (Fortas, J., concurring in part and dissenting in part). "It is only by prohibiting the Government from compelling an individual to cooperate affirmatively in securing incriminating evidence which could not be obtained without his active assistance, that 'the inviolability of the human personality' is assured." *United States v. Dionisio,* 410 U.S. 19, 34–35, 93 S.Ct. 781, 782–83, 35 L.Ed.2d 67 (1973) (Marshall, J., dissenting). It is this coerced expression of will that is unreliable as evidence and destructive of personal integrity.

The issue is not the same as when a defendant is compelled to produce physical evidence. The courts of this state have generally agreed with the holding of *Schmerber v. California,* 384 U.S. at 757, 86 S.Ct. at 1826, that compelling a defendant to provide physical or real evidence does not violate the privilege against self-incrimination. *See, e.g., Biggers v. State,* 411 S.W.2d 696, 698 (Tenn.1967) (repetition of words); *State v. McAlister,* 751 S.W.2d 436, 440 (Tenn.Crim.App.1987) (samples of hair and bodily fluids); *State v. Mabon,* 648 S.W.2d 271, 275 (Tenn.Crim.App.1982) (taking x-rays); *State v. Henderson,* 623 S.W.2d 638, 641 (Tenn.Crim.App.1981) (display of distinctive tattoo); *Trail v. State,* 526 S.W.2d 127, 129 (Tenn.Crim.App.1974)

(field sobriety tests); *Black v. State,* 479 S.W.2d 656, 658 (Tenn.Crim.App.1972) (display of physical characteristics before jury); *Powell v. State,* 489 S.W.2d 538, 540 (Tenn.Crim.App.1972) (repeating words for identification). The principles expressed in *Schmerber,* however, are not necessarily those incident to the privilege under our constitution.

Explaining why real or physical evidence lies outside the protection of the right against self-incrimination, the majority in *Schmerber,* which involved only the taking of a blood sample, reasoned that a defendant's "testimonial capacities [are] in no way implicated; indeed *his participation,* except as a donor, [*is*] *irrelevant* to the results of the test, which depend on chemical analysis and *on that alone.*" 384 U.S. at 765, 86 S.Ct. at 1832–1833 (footnote omitted) (emphasis added). In the case of handwriting, however, the accused's participation is not irrelevant to the results of the test. It is essential, for the accused is "compelled to give to the State evidence against himself which could be secured only through his affirmative cooperation." *United States v. Dionisio,* 410 U.S. at 36, 93 S.Ct. at 783 (Marshall, J., dissenting). There is a clear distinction here between the passive submission required of a defendant in other cases, and the intrusive violation of the will of the accused involved in the giving of a handwriting exemplar. *See id.,* 410 U.S. at 37, 93 S.Ct. at 784 (Marshall, J., dissenting).

That the compulsion of handwriting exemplars entails something more than the submission involved in taking physical evidence like blood and fingerprints becomes apparent when the nature and value of handwriting examples as evidence are analyzed. The position that the compulsion of real or physical evidence is exempt from the constraints of the privilege is based upon the premise that the privilege protects only evidence of a testimonial or communicative nature. *See Schmerber,* 384 U.S. at 763–764, 86 S.Ct. at 1832; *State v. Mabon,* 648 S.W.2d at 275. Even assuming, without necessarily accepting, the validity of this position, *see Schmerber,* 384 U.S. at 774–778, 86 S.Ct. at 1837–1839

(Black, J., dissenting), the handwriting exemplars fall within the privilege because they are testimonial in nature.

While the lines drawn by a writer have no testimonial content, the actual making of the sample contains an element of testimony. Implicit in the act is the statement, "This is my normal handwriting." *United States v. Izzi,* 427 F.2d 293, 295 n. 1 (2d Cir.1970); Weintraub, *Voice Identification, Writing Exemplars and the Privilege Against Self–Incrimination,* 10 Vand. L.Rev. 485, 496–497 (1957); Comment, 40 U.M.K.C.L.Rev. 51, 56 (1971). As a result, the veracity of the defendant, the heart of testimonial evidence, is involved in this sort of evidence while it is not involved in the so-called "real" evidence admissible under *Schmerber* and the Tennessee decisions. It is not within the accused's power to change his fingerprints, hair, breath or blood. But a handwriting exemplar requires the truthful participation of the accused if it is to possess any evidentiary value. The privilege against self-incrimination resulted from attempts to extract from a person's lips a true statement concerning his guilt and thereby to supply the needed proof against himself. The privilege should, therefore, apply to any compelled conduct the accused can control as a means of expressing ideas inherent in which is the accused's veracity. Weintraub, *supra,* at 499, 507; 40 U.M.K.C.L.Rev., *supra,* at 56.

For these reasons I would hold that the court's compelling the defendant to provide a handwriting exemplar violated his privilege against self-incrimination under Article I, § 9 of the Tennessee Constitution. It is improper for the State to elicit testimony for which an accused has claimed his privilege *against self-incrimination* or to allow any adverse inference to be drawn from his assertion of this privilege. *See Harrison v. State,* 532 S.W.2d 566, 571 (Tenn.Crim. App.1975); *cf. State v. Hale,* 672 S.W.2d 201 (Tenn.1984); *Staples v. State,* 89 Tenn. 231, 14 S.W. 603 (1890). Therefore, evidence of the defendant's refusal to give a handwriting sample should not have been admitted, and the trial court should not

have instructed the jury as to any inference that could have been drawn therefrom.

## EVIDENCE OF OTHER CRIMES

I would hold that the admission of evidence of other crimes committed by the defendant was not harmless error. Over defendant's objection, co-defendant Joseph DeModica testified that earlier during the week of the murders, while the defendant, DeModica, Silvers, and Pelley were staying at the residence of Tracey Clark in Knoxville, the defendant and DeModica stole jewelry and two credit cards from the home of Clark's elderly neighbor and pawned some of the stolen jewelry. Tracey Clark was also permitted to testify that the defendant and his companions had taken some jewelry from her neighbor's house. DeModica further testified that when he and his comrades left Tim Farmer's apartment the day of the murders they took two coats, a tapestry, and a radio and attempted to sell the coats to Johnnie Schultz in Dandridge, Tennessee. Farmer himself testified that after the defendant and his companions had left, Farmer discovered that a fur coat had been stolen and an AM/FM cassette player was missing from his residence.

The law recognizes that evidence of another crime committed by the defendant is of a highly prejudicial nature, *McLean v. State*, 527 S.W.2d 76, 84 (Tenn.1975), and that evidence of other crimes should be admitted at trial only when the fact of the crime is relevant to some other matter actually at issue in the case (for example, intent, motive, identity, absence of mistake, etc.) and the probative value of the evidence is not outweighed by its prejudicial effect. *State v. Carter*, 714 S.W.2d 241, 245–246 (Tenn.1986); *State v. Parton*, 694 S.W.2d 299 (Tenn.1985); *Bunch v. State*, 605 S.W.2d 227 (Tenn.1980). The State argued, and the trial judge found, that evidence of these crimes was relevant to corroborate the testimony of accomplice DeModica to show the defendant's presence in the area and his association with DeModica at the time of the murders. The record, however, reveals that proof regarding the thefts from Clark's neighbor and Tim Farmer was unnecessary for this purpose. The testimony of Farmer and Clark already established that the defendant and DeModica were companions at this time and were in the Knoxville–Gatlinburg area. The testimony of the pawn broker from Knoxville and of Johnnie Schultz placing the two men together in the area required no reference to the alleged thefts. In effect, the defendant was on trial for robbery as well as murder; the evidence indicated a character disposed to take the property of others.

The majority Opinion acknowledges that evidence of other crimes "was unnecessary" but excuses the admission of that evidence on several grounds, none of which are sufficient. The majority first states that "such proof was not extensive or emphasized." To my knowledge, however, the well-established rule regulating the admission of evidence of other independent crimes has not been modified to provide that only extensive or emphasized evidence that the defendant has committed other crimes is not admissible. The majority further excuses the erroneous admission of the evidence with the conclusory statement that the admission was clearly harmless beyond a reasonable doubt.

That evidence of other crimes is prejudicial is axiomatic. The Court in *Bunch v. State*, 605 S.W.2d 227 (Tenn.1980), after stating the rule that evidence that the defendant has committed other crimes is usually not admissible because it is irrelevant, recognized the prejudicial nature of such evidence with this observation:

> Moreover, because of the obvious prejudice of such evidence to the defendant its admission often constitutes prejudicial error, requiring the reversal of a conviction.

605 S.W.2d at 229. The highly prejudicial nature of such evidence is implicit in the remaining portion of the rule, which provides that even if such evidence is relevant to some matter actually in issue, it is admissible only if its probative value outweighs its prejudicial effect upon the defendant. *Id.*

The majority Opinion cites no authority for the proposition that the "Court must assume" that the jury disregarded the prejudicial evidence in assessing the death penalty. In *State v. Lawson*, 695 S.W.2d 202 (Tenn.Cr.App.1985), relied upon by the majority, the Court of Criminal Appeals affirmed the defendant's conviction of receiving stolen property. The Court of Criminal Appeals in that case found that the statement made by the Assistant District Attorney General, though improper, did not affect the judgment of guilty. A different issue is presented in the case before the Court. Nor does *State v. Carter*, 714 S.W.2d 241 (Tenn.1986), cited by the majority, support its conclusion that the error was harmless. Although evidence in that case of the defendant's prior criminal acts was improperly admitted for the purpose of identification, the Court found that "the jury legitimately learned that Price and the defendant were engaged in similar illegal activity." Since the jury in *Carter* properly knew of the criminal acts, formal admission of this evidence obviously did not further prejudice the accused. The "findings" by the majority that evidence of the several felonies committed by the defendant the day before the murders were committed "added no 'new dimension to the jurors' view of defendant'" is disingenuous. There simply is no reasonable basis on which to reach that conclusion. What evidence there is would suggest the opposite. The offenses named by the majority as conclusively foreclosing any possibility that at least one juror might vote for life imprisonment were crimes that the defendant had committed ten years earlier and for which he had been convicted and served the designated sentences. The inadmissible evidence reasonably could have been considered by some jurors as showing that the defendant was an unredeemably bad person. Such evidence is clearly prejudicial.

The majority further excuses the admission of the prejudicial evidence with the statement that the proof of the defendant's guilt is overwhelming. The evidence found to be overwhelming was the testimony of DeModica, the admitted accomplice, with the suspect handwritten note attributed to the defendant affording the only corroboration. In addition, the conclusion that the proof of the defendant's guilt is overwhelming provides no support for the majority's position. The rule in determining whether an error was harmless is not whether there was sufficient other evidence on which to find the defendant guilty, or even on which to impose the death penalty. The issue is whether the inadmissible evidence, in and of itself, was harmful. That determination necessarily requires viewing the evidence from the viewpoint of the jury, which has the obligation to decide if the defendant will be sentenced to life imprisonment or death. Discussing the responsibility of the jury, Justice Marshall stated:

> [A]lthough much of the [United States Supreme Court's] capital jurisprudence since *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), has been focused on guiding and channeling the decision whether death is the appropriate sentence in a specific case, the sentencer nonetheless is afforded substantial discretion. Even in the face of overwhelming aggravating evidence, the sentencer has discretion to act with leniency and refuse to impose the death sentence. See [*McCleskey v. Kemp*, 481 U.S. 279, 311, 107 S.Ct. 1756, 1777, 95 L.Ed.2d 262 (1987)] ("[D]iscretionary exercises of leniency [by the sentencer] are final and unreviewable").

*Satterwhite v. Texas*, 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988) (Marshall, J., concurring in part and concurring in the judgment) (citations omitted). A reviewing court cannot know the significance placed by the jury on evidence that is admittedly prejudicial.

In a capital case, consideration of the effect of error is not limited to the jury's determination as to guilt but also must extend to the decision on sentencing. At this point, the doctrine of harmless error becomes particularly inappropriate. A capital sentencing determination, "even when guided and channeled, [is] inherently subjective, and the weight a sentencer gives ... a significant piece of evidence ... is

nowhere apparent in the record." *Satterwhite v. Texas*, 486 U.S. 249, 262, 108 S.Ct. 1792, 1800, 100 L.Ed.2d 284 (1988) (Marshall, J., concurring in part and concurring in judgment). Because of the substantial discretion given the sentencer in weighing and evaluating aggravating and mitigating circumstances under our statute, this Court has no way of knowing whether the jury would have imposed the death penalty if erroneously admitted evidence had not been before them. *Cf. State v. Moore*, 614 S.W.2d 348, 352 (Tenn.1981). Furthermore, because of the need for heightened reliability in capital sentencing, any error potentially affecting the jury's consideration of aggravating or mitigating factors should be harmless beyond any reasonable doubt before this Court will affirm a sentencing determination tainted by such error. *Cf. State v. Hines*, 758 S.W.2d 515, 524 (Tenn. 1988) (applying this standard to error, both procedural and constitutional in nature, at capital sentencing).

The jury in this case was instructed that it might consider the proof from both the guilt and sentencing phases of the trial. The evidence of other crimes was part of this proof. One significant circumstance that reasonably could have affected the subjective judgment of the jurors is the role of the defendant as principal or accomplice in these offenses and the objective fairness of the punishment imposed upon the defendant and that received by DeModica. The extent of the defendant's participation in the killings, particularly in comparison to that of DeModica, is not without serious doubt. The State relied heavily on the note describing DeModica as the hands-on leader in the killing. The note, which the State claimed the defendant wrote, stated, "Joe [DeModica] went crazy, cut them up." Nevertheless, "Crazy Joe" was the State's case; and the jury knew to a certainty that he was not testifying for the State in exchange for a seat in the electric chair. The defendant argued and the court instructed the mitigating circumstance that the defendant was an accomplice rather than a principal in the murders. With what assurance can the majority say that the additional evidence that the defendant was a bad person did not affect the jury's determination regarding this mitigating circumstance and the fairness of the punishment imposed on the defendant?

The majority's conclusion that the error was harmless rests on no recitation of facts or reasoning. The conclusion is asserted "in the context of the entire record." The standard for determining whether the error was harmless or prejudicial should be "beyond a reasonable doubt." I find extraordinary the majority's conclusion that the jury beyond a reasonable doubt would have imposed the death penalty even in the absence of evidence that the defendant recently had committed multiple felonies. In dissent, I can only say that neither the record nor the majority's opinion has demonstrated any basis for that conclusion.

### PROOF OF AGGRAVATING CIRCUMSTANCE

The jury found the aggravating circumstance set forth in T.C.A. § 39–2–203(i)(5) (1982), ("[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind"). As in *State v. Black*, 815 S.W.2d 166, 196 (Tenn.1991), this aggravating circumstance could only have been based upon a finding of depravity. Regarding the murder of Valentine, the proof shows that Valentine was unconscious when killed and since under *State v. Williams*, 690 S.W.2d 517 (Tenn.1985), "torture" requires that the victim be conscious, torture could not have been found by the jury. As for Melissa Hill's killing, the jury expressly found in its verdict form that it involved depravity of mind, and the form did not mention torture as an element of its finding. Consequently, the instructions provided no help in guiding the jury to its decision of whether the murderers were "especially heinous, atrocious, or cruel in that [they] involved ... depravity of mind." The *Williams* definition of depravity, charged by the trial court in this case, is "[m]oral corruption; wicked or perverse act," 690 S.W.2d at 529. This definition is merely a slight expansion of a circle of synonyms, none of which have sufficient meaning to guide or limit the jury in its

otherwise unfettered discretion. The jury in this case received no guidance in determining whether the defendant's mind was materially "depraved" beyond that of any first-degree murderer, and was bestowed unconstitutionally unfettered and unguided discretion in applying this aspect of aggravating circumstance (i)(5). *See Shell v. Mississippi,* 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990) *(per curiam* with Marshall, J., concurring); *State v. Black,* 815 S.W.2d 166, 195–97 (Tenn.1992) (Reid, J., dissenting).

In response to the insistence in the dissent in *State v. Black,* 815 S.W.2d at 197, and in this dissent, suggesting that "depravity" be defined so that juries will have some constitutional guidance in determining the acts that are sufficient to justify the imposition of the penalty of death, the majority merely restates the manner in which the victims were killed. It seems obvious that the facts of every killing can be described in sordid detail. Such descriptions, however, do little to give guidance to prosecutors, trial courts, and jurors regarding those offenses that meet a standard designed to identify those defendants who, under the constitution, qualify for the death penalty.

Again, I urge that some standard definition of "depravity of mind" be used in determining whether, under constitutional principles, the accused should be executed. *See State v. Black,* 815 S.W.2d at 197 (Reid, C.J., dissenting) (suggesting a standard). In the absence of such direction, I would hold that the sentence based on this aggravating circumstance is invalid. Regardless of errors at the guilt phase of the trial, the case therefore should be remanded for a new sentencing hearing.

## COMPARATIVE PROPORTIONALITY REVIEW

This Court has failed to articulate and apply a standard for comparative proportionality review of the death sentence mandated by T.C.A. § 39–13–206(c)(1)(D). This statute places upon the Court more than the mere responsibility of reviewing the assignments of error made by the appellant or the obligation to ascertain that the sentence has been legally imposed. It contemplates that this Court will act independently to ensure the constitutionality of each sentence by determining that the death penalty is not "excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant." *Id.* In § 39–13–206(c)(2), the Court is empowered to develop rules and procedures to enable it to perform this duty properly. Through these statutes the General Assembly has established an additional safeguard against the constitutional concerns of capricious and freakish imposition of the death penalty by placing upon this Court the task of meaningful appellate review designed to distinguish "the few cases in which [the death penalty] is imposed from the many cases in which it is not." *Furman v. Georgia,* 408 U.S. 238, 313, 92 S.Ct. 2726, 2764, 33 L.Ed.2d 346 (1972) (White, J., concurring); *see generally Gregg v. Georgia,* 428 U.S. 153, 195, 198, 96 S.Ct. 2909, 2935, 2937, 49 L.Ed.2d 859 (1976) (plurality opinion).

Comparative review obligates the Court to determine through an analysis of cases from the entire state those categories of homicides that society, as represented by the members of the petit juries faced with this sentencing determination, deems serious enough to warrant the extinguishment of a human life. *See Gregg v. Georgia,* 428 U.S. at 223–224, 96 S.Ct. at 2948–2949 (White, J., concurring). Each jury can act only within the narrow realm of the specific case before it. While the statutory sentencing guidelines should assure that the death penalty will not be imposed except in the most serious of homicides, this Court, able to consider not just individual cases but the spectrum of sentences in cases statewide, is charged with guarding against arbitrary, capricious, and freakish imposition of capital punishment. The statute, which reflects a constitutional safeguard, imposes an original and additional duty on the Court as a part of the procedure for selecting those for whom the death penalty is reserved, those deemed the most culpable, the worst of the bad.

In the present case, the majority performed this profound duty with the conclusory statement:

> Our comparative proportionality review convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the Defendant.

The statute and the constitution require more.

If appellate review is to be meaningful, then it is this Court's duty and obligation to explain and set forth in its opinions the process by which it has concluded that a case falls within that class of offenses society has seen fit to punish with death. The Court must develop and apply objective criteria and procedures for comparing all first degree murder cases and in each capital case expressly analyze those features showing it to be similar to or different from other first degree murders.

This process of intense analyzation is a difficult duty; however, it will assure not only meaningful appellate review but also assist in clarifying what type of crime is indeed capital. Under such a system a standard of consensus will develop to guide not only courts and juries in deciding cases, but also prosecutors in determining whether the circumstances of a case justify seeking the death penalty. In such a way, rigorous and searching proportionality review lessens the arbitrariness of capital sentencing, ensures the principled imposition of· the penalty, and permits the infliction of death only where such a sanction is warranted. *See State v. Black*, 815 S.W.2d at 193–195 (Reid, C.J., dissenting).

## OTHER ISSUES

Although the manner in which *voir dire* was conducted in this case does not constitute reversible error, the procedure followed by the trial court is not that which is best calculated to inspire confidence in the jury selection process. The trial court frequently supplied prospective jurors with the answers to questions asked them, while on occasion literally "putting words" into their mouths. The trial court appeared too ready to excuse jurors who had reservations about the imposition of the death penalty. His explanation was that the court did not wish to "impose" upon citizens. Further, the trial court's adamant denial of counsel's request that an effort be made to rehabilitate prospective jurors on the question of death qualification is troublesome. While rehabilitation was not required under the standards of *State v. Alley*, 776 S.W.2d 506 (Tenn.1989), and *State v. Strouth*, 620 S.W.2d 467 (Tenn. 1981), in the specific instances complained of in this case, the court's ruling on this issue seemed based on an antipathy to rehabilitation in general and a desire to assure quick jury selection, rather than a consideration of the specific circumstances regarding each juror and the need to guarantee the constitutional rights of the defendant. The rule regarding the voir dire of the venire established in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and followed in *Beaver v. State*, 475 S.W.2d 557 (Ct.Crim.App. 1971), is as follows:

> [A] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.... [T]he most that can be demanded of a venireman is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings. Exclusion on any broader basis than this makes the carrying out of the death sentence constitutionally impermissible.

475 S.W.2d at 559 (citation omitted) (emphasis in original). To excuse a juror for cause based on his absolute unwillingness to consider imposing the death penalty, "(a) disqualifying statement must be unambiguous and it can never be assumed otherwise that that is the position of the prospective juror." *Id.* at 558. *See also State v. Har-*

*rington,* 627 S.W.2d 345, 349–50 (Tenn. 1981). Erroneous excusal of any juror in violation of the principles of *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); and *Witherspoon v. Illinois,* 391 U.S. at 510, 88 S.Ct. at 1770, can never be harmless error. *Gray v. Mississippi,* 481 U.S. 648, 668, 107 S.Ct. 2045, 2057, 95 L.Ed.2d 622 (1987). For this reason, a trial court should exercise care in refusing counsel the opportunity to rehabilitate a prospective juror on his or her views regarding the death penalty whenever any ambiguity exists as to the juror's qualifications. While rehabilitation is subject to abuse by counsel and must be controlled by the court, questioning by counsel often clarifies a prospective juror's views and offers a new perspective on the juror's answers. This precaution helps assure compliance with the principles of *Witt, Adams,* and *Witherspoon.* It also reassures the defendant, the jury, counsel, and the reviewing court that the defendant received a fair trial.

The present case raises other issues, two of which I find unnecessary to resolve. First of all, the defendant contends that the death penalty violates Article I, § 16 of the Tennessee Constitution. Because I find other errors requiring remand for a new trial, I pretermit this issue. *See State v. Black,* 815 S.W.2d at 191 (Reid, C.J., dissenting). Since the present defendant was found guilty of premeditated murder as well as felony murder, I also refrain from addressing any of the problems arising under the state constitution when the death penalty is imposed for the crime of felony murder. *But see* Rosen, *Felony Murder and the Eighth Amendment Jurisprudence of Death,* 31 B.C.L.Rev. 1103 (1990).

In conclusion, because of errors committed during both the guilt and sentencing phases in this case, I would reverse and remand for a new trial. I am authorized to say that Justice Daughtrey joins in this dissent.