# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
June 4, 2002 Session

## STATE OF TENNESSEE v. JUSTIN GENEL HILL

**Direct Appeal from the Circuit Court for Obion County**
**No. 0-201    William B. Acree, Jr., Judge**

---

**No. W2001-01274-CCA-R3-CD  - Filed March 19, 2003**

---

An Obion County grand jury indicted the defendant, Justin Genel Hill, of two counts of first degree murder and one count of conspiracy to commit first degree murder.[1]  In a separate indictment, Clarence Carnell Gaston, Miqwon Deon Leach, and Mario Deangelo Thomas were also charged with crimes arising out of the same criminal episode.  The defendant and these three men were tried in a single jury trial.  The jury found Gaston, Leach, and Thomas guilty of conspiracy to commit first degree murder, second degree murder, and first degree felony murder and found the defendant guilty of facilitation to commit second degree murder.  See State v. Clarence Carnell Gaston, No. W2001-02046-CCA-R3-CD, 2003 WL 261941, at *1 (Tenn. Crim. App. at Jackson, Feb. 7, 2003).  For the defendant's conviction, the trial court sentenced him to serve a ten-year sentence in the Department of Corrections.  The defendant now brings this appeal of his conviction, alleging that the evidence introduced at trial is insufficient to support his conviction.  After reviewing the record and applicable law, we find that the defendant's allegation lacks merit and accordingly affirm the defendant's conviction.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JAMES CURWOOD WITT, JR., JJ., joined.

John M. Miles, Union City, Tennessee, for appellant, Justin Genel Hill.

Paul G. Summers, Attorney General & Reporter; P. Robin Dixon, Jr., Assistant Attorney General; Thomas A. Thomas, District Attorney General; and Jim Cannon, Assistant District Attorney General, for appellee, State of Tennessee.

---

[1]    Nicholas Andre Hanserd was also named in the defendant's indictment for having committed these same charges.  However, as discussed infra, Hanserd negotiated a plea agreement with the state and testified for the state at the defendant's trial.

# OPINION

## Factual Background

Clarence Carnell Gaston, Miqwon Deon Leach, and Mario Deangelo Thomas, who were also involved in the instant crime and who were tried for their crimes in the same trial as the defendant, also appealed their convictions in a separate appeal. See Clarence Carnell Gaston, 2003 WL 261941, at *1. When considering their appeal, this Court summarized the facts of the instant crime, in relevant part, as follows:

> On New Year's Day 1999, the victim, Zachary Demond Achols, was shot and killed as he was standing with a group of men outside the VIP Social Club at 1212 East Main Street in Union City. Jeff Young, one of the men with whom the victim was standing, was wearing red clothing. According to eyewitnesses, a second group of men, including defendant Gaston, approached the first group and, upon Gaston's direction to shoot the one in red, opened fire, striking and killing the victim. The defendants were subsequently charged with conspiracy to commit first degree murder, first degree felony murder, and first degree premeditated murder. Although the State originally filed notices of its intention to seek the death penalty against the defendants, it subsequently withdrew those notices, substituting notices of its intention to seek life sentences without the possibility of parole. The three defendants in this appeal and a fourth co[-]defendant, Justin Hill, who was charged with the same offenses, were tried jointly before an Obion County Circuit Court jury from March 12-17, 2001.

## State's Proof

> Union City Police Officer Robby Orsborne testified that he was investigating a complaint of loud music in the East College Court area at approximately 1:40 a.m. on January 1, 1999, when he heard eight to ten gunshots from the area of Main Street and Nash, where the VIP Club was located. Officer Stan Haskins, the first officer to respond to the shooting, testified that as he drove to the scene he was flagged down by one of approximately ten African-American men who were standing in a "semi-huddled" fashion at the southwest corner of the building. When he got out of his car and approached the group, he saw the victim lying on the ground at the corner of the club. The victim was not breathing and had no discernible pulse.

> Ted Alexander, the manager of a band that had played that evening at the Union City VFW, located on Main Street just east of the VIP Club, was in the parking lot behind the VFW building preparing to leave when he heard gunshots from the direction of Main Street, near the front of the club. Alexander testified that after calling 9-1-1 from his car phone, he saw two African-American men run to a

maroon-colored car that was parked close to his vehicle. The taller and slimmer of the two men ran to the driver's side of the car. The second man ran to the passenger door, either retrieved a weapon from the car or reloaded one that he already had, and fired three or four shots across the front of Alexander's car at a person in a red shirt who was running in the direction of Vine Street through a vacant lot behind the buildings. The two men then got into their car and sped off. During the same period, Alexander heard more gunshots fired and saw a red car pull up and then speed away. Alexander testified that he was a retired officer of the sheriff's department and, based on his experience with firearms, was able to determine that the twelve to fifteen rounds he heard fired that night came from two different caliber weapons.

Paul Warner testified that he was outside the Snack Shop, a business located on Main Street across from the VFW, on January 1, 1999, when he heard gunfire and looked up to see two individuals at the southwest corner of the VIP Club firing at another individual who was running from them. Warner went into the Snack Shop to telephone the police. While inside, he heard three or four more gunshots and looked out the window to see someone running through the parking lot. After going back outside, Warner saw three or four men standing in the middle of Main Street. He said that he heard one of the men issuing directions, saying, "'You go this way, and you go that way, and you go this way.'" According to Warner, all of the men then "went in different directions," with one man running east down Main Street, another heading west, and a third going north between the VIP Club and the VFW.

Warner testified that he saw another individual standing at the corner of the club, looking down at the ground and nudging something with his foot. Assuming that someone had been shot, Warner went back into the shop and phoned for an ambulance. As he looked out the window, he noticed a man putting something into the trunk of a blue Caprice Classic that was parked in the Snack Shop's parking lot. Warner said that something about the man's appearance, perhaps his clothing, gave him the feeling that he was one of the two gunmen he had just seen. As he watched, the man closed the trunk and got down in the backseat of the vehicle, where he could not be seen. Another man came from across the street, hunkered down, got into the driver's seat, and started the engine. As they drove off, Warner went outside and recorded part of the vehicle's license plate number, which he subsequently provided to the police. On cross- examination, Warner testified that he did not remember what the two men in the Caprice had been wearing and acknowledged that he was not certain they had had anything to do with the shooting.

Bobby Lee Allen testified that he was walking to the VIP Club on January 1, 1999, when he saw a man "come out running across Vine Street towards E.W. James." Allen said there were two men behind the first man, and they "dropped down and started shooting at him," stopping only when their guns were empty. Because it was dark, he could not identify any of the men involved or their race.

Union City Police Sergeant Dave Davis, the supervisor on duty at the time of the shooting, testified that a "hostile crowd" of about 200 screaming people, in which several fights were breaking out, was in the parking lot and around the VIP Club when he arrived. During his initial period at the scene, when he was one of only four officers present, he and Officer Haskins were struggling to keep the victim in one spot while the crowd was trying to move him. After additional officers from the police and sheriff's departments arrived in response to his radioed calls for help, they were able to disperse the crowd and secure the scene.

Sergeant Mike George, the first investigator to arrive, testified that officers initially recovered eight bullet casings from the crime scene. They later found three more, including two that were recovered from the vicinity of the E.W. James parking lot located off Vine Street to the west of the VIP Club. A total of four bullets were recovered: two from automobiles parked at the scene, one from the corner of a building near the E.W. James parking lot, and one from the victim's body. Sergeant George testified that Warner provided the partial tag number of either "35N" or "3NF" for the blue Caprice he had seen in the Snack Shop's parking lot and, additionally, reported that there was something "funny" about the license plate. A blue Chevrolet Caprice matching Warner's description, with a personalized Tennessee plate and the tag number "735N," was later located in the parking lot of an apartment complex in Fulton, Kentucky. The vehicle was registered in the name of LaDonna Brooks.

Dr. Cynthia Gardner, the medical examiner who performed the autopsy of the victim's body, testified that the victim died as the result of a gunshot wound in which the bullet traveled in a downward path from his back into his chest, passing through his heart and severing his spinal cord and several of his major blood vessels. She said that the bullet entered the victim at the back of the base of his neck, went through his spinal cord, superior vena cava, aorta, left pulmonary artery and the right ventricle of his heart, and stopped at the space below his fourth rib. Dr. Gardner agreed that one possible scenario that would explain the path of the bullet was that the victim was shot by someone standing over him as he was lying on the ground. She found no evidence of alcohol or drugs in the victim's body. Agent Robert Daniel Royce, a firearms examiner with the Tennessee Bureau of Investigation, testified that the bullet from the victim's body came from a .380 automatic weapon. Seven of the shell casings recovered from the scene came from a .380 automatic, while the remaining three shell casings came from a .9 millimeter Luger.

Jeff Young testified that he arrived at the VIP Club around midnight on New Year's Eve. He saw and spoke with the victim, as well as with Justin Hill and a man named Daman Biffle. In addition to these men, he said that he saw each of the defendants in the club. At some point, he, Jarvis Jones, Kim ("Kemp") Brown, Clarence Jones, and the victim decided to go outside the club, to the corner between

the VIP and the VFW, to smoke marijuana. However, before they could light their "joint," Gaston came around the side with a group of men. Young described what occurred:

Well, it started when [Gaston] came to the side, and he was on the other side of the cars that was there on the side of us, and he was saying, "Yeah, that's him, that's him in the red. Shoot, shoot, shoot. Fire, fire, fire." So, then, we all looked back, and that's when we seen the rest of 'em, like, in the front of us, like, looking to the right, and that's when I seen [Leach]. He was-- well, we call it jackin' the gun off. And that's when I started to run, and the rest of us ran.

Young testified that he never looked back to see how many people were shooting, but Leach, who had an automatic weapon, was the only one he saw with a gun. However, he knew there was more than one gun because he heard several shots fired, including different rounds fired at the same time. He said that he escaped by running to a nearby house. As he was behind the house, he saw one of Gaston's cars, a burgundy Buick Park Avenue, traveling up Vine Street in the direction of the club. Young acknowledged that he was serving time for two drug convictions and was facing charges on two additional offenses, but said that he had not been promised anything in exchange for his testimony.

Young testified on cross-examination that he had never had any trouble with Gaston, and he was not aware of any grudge Gaston may have held against him. He said that Gaston was about five to ten feet from him when he first saw him outside the club, but admitted that he may have said at the preliminary hearing that he was thirty to forty feet away. He testified that there were at least five people with Gaston, one of whom was Daman Biffle, and that he did not see Gaston with a gun. He admitted that he went home to Jackson, Tennessee, after the crime and did not talk to the police until January 6, 1999, when he telephoned a woman named Brenda Brown at a time when Captain Barfield of the Union City Police was present at her home. He "guess[ed]" it was true he was originally a suspect in the case, admitted that he had not voluntarily gone to the police, and acknowledged that the first time he talked with the police about the case, other than during his January 6 telephone conversation with Captain Barfield, was after he was arrested. He conceded that Thomas and Gaston were the only two defendants he named during his initial telephone conversation with Barfield; the other men he only described. He acknowledged having described one of the men as cross-eyed and said that Leach was that man. He never saw Thomas with a gun. On redirect, he testified that he had been wearing red on the night of the shooting and that he had identified Leach from photographs shown to him by the police.

Jarvis Jones testified that he went to the VIP Club on New Year's Eve with Jeff Young and "Kemp." After meeting the victim inside the club, the four of them

decided to go outside to smoke marijuana. Jones described what occurred when they went outside:

> A. Stepped outside, and no sooner did we get to the corner of the club, some guys come out. I seen Mr. Gaston, he came out, and he directed 'em to us, like tellin' 'em to go ahead and shoot us, or whatever.
> Q. Do you recall what you heard Mr. Gaston say?
> A. He said, "Red, red, let it go right there."

Immediately after Gaston's command, Jones saw Leach pull out a chrome pistol. At sight of the pistol, Jones turned to run between the VIP building and the VFW but fell to the ground when one of his companions stepped on his heel. He said that he "sat there for a minute" and "played dead." He then heard Gaston say, "Yeah, you got him, you got him" and saw, out of the corner of his eye, Thomas approaching armed with a black automatic gun. When he heard Thomas say, "Where he at, where he at?" he jumped up and ran behind the club across the empty E.W. James parking lot to the Stephens Motel, hearing gunshots behind him as he did so. Jones made positive courtroom identifications of Gaston, Leach, and Thomas and testified that he heard a total of more than ten gunshots.

On cross-examination, he testified that Gaston was alone when he first saw him come around some cars outside the club. He heard Gaston say, "Red, red. There them niggers go right there." He assumed the other men, who came around within "[s]econds" of when he first saw Gaston, came from the front of the club, "the same place [Gaston] come from." He went on to testify, however, that he saw Thomas come from around the corner and that Leach was in the street. He said that he ran when he saw Leach bring out a large, chrome pistol and that he fell to the ground after running approximately one-third of the distance from the front corner of the building to the back. After falling to the ground, Jones crawled between some cars and lay still, pretending to be dead. He first recognized Leach after he had fallen to the ground and was lying between the cars. He acknowledged having told investigators that Leach had been wearing a hooded jacket and that he had been unable to see the top portion of his face.

Jones provided contradictory testimony about whether he had looked underneath or around the cars to see Thomas with the gun. Nonetheless, he was confident he had seen Thomas and that he had had a gun. He acknowledged that it was dark, and there were no lights in the area where he was lying. He also acknowledged that he had only seen Thomas two or three times prior to the shooting. Jones said he went home to Jackson, Tennessee, the day after the shooting and later went to Mammoth Cave, Kentucky, to participate in a Job Corps program. He did not talk to the police until they came to see him at Mammoth Cave. Jones acknowledged

he and Jeff Young had smoked marijuana and drunk alcohol earlier in the evening, and they had discussed the shooting by telephone before he first talked to the police.

Nicholas Hansard, who said he was originally from Rockford, Illinois, testified that he first came to Union City in August 1998. At that time, several of his friends, including Miqwon Leach, Mario Thomas, Justin Hill, and Daman Biffle, had already been in the area for about a month. Hansard said that approximately three weeks before the shooting, Leach told him that he had been robbed the day before by Red Boxley and Jeff Young. On New Year's Eve 1998, he heard Thomas, Hill, and Leach discussing Young, saying that if they saw him at the club they were going to "get him." Hansard said that he went to the club later that night with Thomas and Thomas' girlfriend, Toya, and saw Gaston inside the club.

Hansard testified that he was dancing with a woman named Sonya Polk when Leach motioned him over and told him that it was about to "go down," that they were about to get Young. He said that he followed "'em" outside, where he saw that both Leach and Gaston had guns. Next, Gaston, who had a "very mean" look on his face, pointed and said, "Get 'em." Hansard said that he ran and hid behind a car and then heard gunshots. When the gunshots stopped for a moment, he peeked around the car and saw Leach and Hill standing at the corner of the building, with Leach kicking the victim who was lying on the ground. He did not see Gaston at that point. He next saw Leach and Hill run across Main Street to a parking lot. He never saw Hill with a gun and did not remember having seen Thomas outside the club.

Hansard testified that he had a conversation on January 2, 1999, with Leach and Gaston during which Leach said he had shot the victim, and Gaston said he had chased and fired at Jeff Young by the E.W. James parking lot. Hansard admitted that he had been indicted for the crimes and had agreed to plead guilty to conspiracy to commit homicide, with the degree of homicide to be set after the jury returned their verdicts in the instant case. He acknowledged that the sentence he would receive for his conviction was to be served concurrently to the sentence he was currently serving for a federal drug conviction. Hansard conceded he had, in the past, given several different accounts in statements to law enforcement officials, including that he had not been at the club, that he had been present but had stayed inside, and that he had gone to the door but had gone back inside before the shooting started. He said, however, that he had also previously given the same account that he was providing at trial and that his trial testimony was the truth.

Hansard acknowledged on cross-examination that Hill, Leach, and Thomas had merely discussed "getting" Young, which, he claimed, he had assumed meant roughing him up; no mention had been made of shooting him. Gaston was not present during this conversation and, to his knowledge, was also not present when Young allegedly robbed Leach. Hansard estimated that approximately ten or fifteen

people were outside the club at the time of the shooting. He said that he did not see either Hill or Leach get into a blue Chevrolet and never saw Hill with a gun. He did not see Gaston, Leach, or Thomas in the street.

Demecca Holder testified that she went to the VIP Social Club early on New Year's Day 1999 with LaFaye Johnson and Shyretha Stevens. When they arrived at the club, she and Johnson went inside while Stevens walked in the opposite direction. Holder said that as they went in, Hill, Thomas, Hansard, Gaston, and a man named Kolliepaye passed them going out. Shortly afterwards, Shyretha Stevens came inside the club yelling that there had been a shooting. Holder admitted on cross-examination that she had said in a statement to police that approximately twenty to thirty minutes elapsed from the time she saw the men leave the club until Stevens came inside to report the shooting.

LaFaye Johnson testified that it was approximately 1:00 a.m. when she, Holder, Stevens, and several friends arrived at the VIP Club. Stevens did not go inside but instead stayed outside to talk with someone. Johnson said that the victim was part of a crowd of people that passed her, heading outside, as she was entering the club. She also saw Gaston, Thomas, Hansard, and Leach leaving the club as she went in. She said that she and her companions had just made it to the pay booth when they heard four or five shots, and Stevens, who was crying, came in saying that "they were shooting."

LaDonna Brooks, the registered owner of the blue Chevrolet Caprice located in the parking lot of the Fulton, Kentucky, apartment complex, testified that Justin Hill gave her the money to buy the car and that he had her register it in her name. She said Hill kept the car and drove it; she never used the vehicle.

Sonya Polk testified that she was dancing with Nick Hansard at the VIP Club early on New Year's Day when Leach called him to the side and spoke with him for a moment. She said that the two men then left the club together. Polk testified on cross-examination that she saw Gaston and his girlfriend, Raschelle, leave the club with Thomas and his girlfriend, LaToya, going out the front door. On redirect, she testified that it was after Gaston and Thomas had left the club that she heard gunshots.

Sergeant Mike George, recalled by the State, testified that the front parking lot of the VIP Club was well-lit, with floodlights all across the top of the building. In addition to those lights, there was a security light on the side of the VFW in between the buildings, as well as a security light on a pole at the rear of the VFW. George said that the visibility in the area was generally good, and he had not needed a flashlight to walk between the buildings.

**Defense Proof**

Gaston's first witness, VIP Club owner Harold Hensley, testified that every patron of his club was scanned by a metal detector, designed to detect guns or knives, before entering the establishment. He said that he saw Gaston leaving the club on January 1, 1999, with his girlfriend after the club had closed but did not see Gaston leave at any other time. On cross-examination, Hensley initially testified that he had personally scanned Gaston, Thomas, Leach, and Hill for weapons as they entered the club. He later changed his testimony, stating that Gaston was the only one he could remember personally scanning and that one of his employees may have scanned the others. He had no knowledge of what weapons may have been outside the club. He testified that Gaston and Leach had just left the club when someone told him that there had been a shooting outside. Hensley acknowledged that Gaston's mother was his girlfriend, as well as a long-term employee.

Raschelle Brown testified she had been Gaston's girlfriend for about a year at the time the shooting occurred. She and Gaston arrived at the club before midnight and left at about 1:00 a.m., after someone came into the club yelling that someone had been shot. When they got outside, they saw a crowd of people gathered around someone lying on the ground. She did not see Gaston threaten anyone at the club, or leave the club at any time before his departure with her. On cross-examination, she testified that both she and Gaston were searched with a metal detector before entering the club, but Mr. Hensley was not the one who conducted the search.

Thomas' girlfriend, Catoya Hendrix, testified that she and Thomas arrived at the club at approximately 11:15 p.m. on New Year's Eve and stayed about forty- five minutes before driving to her apartment in Hickman, Kentucky. At the time they left, she was unaware of any sort of altercation having taken place at the club. To question her about the shooting, the police later came to the bank where she worked. Because she was afraid and did not want to get involved, Hendrix lied in her initial statement, telling the police that she did not know Thomas. She acknowledged that she had discussed the case with Thomas.

Leach and Hill rested their cases without presenting any proof. After deliberating, the jury found Leach, Gaston, and Thomas guilty of conspiracy to commit second degree murder, first degree felony murder, and second degree murder. Hill was found not guilty in counts one and two but guilty of facilitation of second degree murder in count three.

Clarence Carnell Gaston, 2003 WL 261941, at *1-*8 (footnotes omitted). The trial court sentenced the defendant to ten years for his facilitation of second degree murder conviction. He brings this

appeal challenging the sufficiency of the evidence to support this conviction. After a thorough review of the record and applicable law, we find that the defendant's challenge lacks merit and accordingly affirm his conviction.

### Sufficiency

The defendant challenges his conviction by attacking the sufficiency of the evidence supporting it. When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" state's witnesses and resolves all conflicts in the testimony in favor of the state. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the state "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779.

In order to prove criminal responsibility for the facilitation of a felony, the state must prove that the defendant, "knowing that another intends to commit a specific felony, but without the intent required under criminal responsibility under § 39-11-402(2), . . . knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a). Second degree murder is defined as "the knowing killing of another." Id. § 39-13-210.

At trial, the state introduced evidence in the form of the testimony of several witnesses linking the defendant to the instant crime. Viewing the evidence in the light most favorable to the state, the defendant facilitated the planning and commission of the murder, as well as the escape from the crime scene after the murder was accomplished. Specifically, evidence introduced at trial indicates that, prior to the commission of the murder, the defendant discussed plans to shoot the victim with Leach, Gaston, and Thomas, and, on the night of the murder, the defendant was present when Gaston ordered the others to shoot the victim. Shortly after Gaston gave this order, Leach, who was armed, announced his intention to shoot the victim, and the defendant watched as Leach began kicking the victim. After the victim was shot, the defendant and Leach ran to a nearby parking lot. A witness saw two men, one of which he believed to have been the shooter, run into this parking lot and drive away from the crime scene in a blue, four-door, Chevy Caprice Classic licensed to the defendant's girlfriend. The defendant's girlfriend testified that she owned a blue, four-door, Chevy Caprice Classic, but that the defendant used her car exclusively. Based on this evidence, again viewed in the light most favorable to the state, a rational trier of fact could have found the defendant guilty of facilitation of second degree murder because the evidence shows that the defendant

furnished substantial assistance in the commission of the crime. We reach this conclusion on the basis that the defendant was present while his co-defendants planned the crime and while the murder itself was committed, and because the defendant provided Leach with a means of leaving the crime scene. See Robert Lawrence Simpkins, Jr., No. M1998-0112-CCA-R3-CD, 2000 WL 14704, at *3 (Tenn. Crim. App. at Nashville, Jan. 7, 2000) (finding that the defendant's knowledge of plans to commit the murder, presence during its commission, and aid to the gunman after the murder were sufficient bases for supporting the defendant's facilitation of second degree murder conviction). Therefore, we affirm the defendant's conviction.

## Conclusion

In light of our analysis above, we find that the defendant's appeal lacks merit. Accordingly, the judgment of the trial court is AFFIRMED.

_____
JERRY L. SMITH, JUDGE