# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
October 26, 2005 Session

## STATE OF TENNESSEE v. FALLON L. TALLENT

**Appeal from the Criminal Court for Wilson County**
**No. 03-0679     John D. Wootten, Jr., Judge**

---

**No. M2005-00183-CCA-R3-CD - Filed January 10, 2006**

---

The Defendant, Fallon L. Tallent, was convicted by a Wilson County Jury of two counts of first degree murder. On appeal, the Defendant contends that the trial court erred when it: (1) allowed Kathleen Griffith, a witness not listed in discovery, to testify; and (2) ordered the Defendant's two life sentences to be served consecutively. Finding no reversible error, we affirm the judgments of the trial court.

**Tenn. R. App. 3 Appeal; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Gregory D. Smith, Clarksville, Tennessee (on appeal) and David Boyd and Craig Garrett, Maryville, Tennessee (at trial) for the Appellant, Fallon L. Tallent.

Paul G. Summers, Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Tom P. Thompson, Jr., District Attorney General; Robert N. Hibbett, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
## I. Facts

This case arises from the killing of two police officers, both of whom died as a result of being struck by a car the Defendant was driving. On July 8, 2003, the Defendant exchanged approximately fifty dollars worth of crack cocaine for a Mercedes Benz. Later that day, the Defendant picked up Dorothy Cash, a former lover and fellow Knoxville prostitute, and Cash and the Defendant spent the night smoking crack and driving around Knoxville and the surrounding areas.

At approximately 8:00 a.m. on July 9, 2003, Officer Blake Barham, of the Knoxville Police Department, noticed the Mercedes parked in a local housing project, the Walter P. Taylor Homes. Officer Barham was informed by his dispatcher that the Mercedes had been reported stolen and

exited his cruiser to investigate. Upon exiting his vehicle the officer recognized the driver of the Mercedes, who he later identified as Fallon Tallent, but, before he reached the Mercedes, the Defendant started her car, shifted it into reverse and drove it into Officer Barham's cruiser. Officer Barham testified that he jumped out of the path of the Mercedes to avoid being struck as it made its way toward his vehicle. After hitting Officer Barham's cruiser, the Defendant quickly drove away.

Officer Barham pursued the Defendant in Knoxville on residential and commercial streets at speeds of up to 70 miles per hour in 30 mile per hour zones. After the Defendant passed several vehicles and began to run through stop signs and stop lights, Officer Barham's supervisor advised him to terminate his pursuit for the public's safety.

Shortly after the chase ended, the Defendant entered Interstate 40 heading west toward Nashville driving at an excessive rate of speed. Cash testified that the Defendant was trying to get the car to go 150 miles per hour, and the Defendant testified that she was going 130 miles per hour on the Interstate. During the course of the trip to Nashville, several motorists called the police to report that the Defendant was driving recklessly. A truck driver, Jerry Carter, called 9-1-1 and stated that if the Defendant was not stopped, someone was going to get killed. Nonetheless, the Defendant continued westbound on Interstate 40, swerving in and out of traffic, passing cars and trucks, and even driving on the shoulder to pass vehicles when necessary.

During the trip from Knoxville to Nashville, the Defendant and Cash smoked the remainder of the crack cocaine in their possession. Police from different jurisdictions pursued the Defendant, yielding pursuit to other units as the Defendant and Cash crossed jurisdictional lines. However, even when the Defendant was not being pursed, she continued to drive at speeds of up to 120 miles per hour, dodging her way through traffic and running vehicles off the road, according to the testimony of the police and other drivers.

As the Defendant approached the main Mount Juliet exit, exit number 226, she warned Cash to be on the lookout for police deploying "spike strips." The Defendant testified that she was familiar with this method of stopping a fleeing vehicle because she had been involved in a high speed chase with the police in March of 2003, in another vehicle which she had acquired in exchange for crack cocaine. That chase ended when the police placed a stinger strip[1] on Interstate 40 in front of the Defendant's vehicle, which she subsequently drove over, flattening her tires.

---

[1]A stinger strip is a device used by police to impede the progress of fleeing vehicles. It is designed to be easy to deploy, to puncture all four tires on the pursued vehicle, and to leave no debris which could affect following vehicles. It has a tough frame of nylon strips holding pointed steel tubes. In use, it is spread out across a surface or thrown towards approaching vehicles, spreading out during flight. An attached rope makes it easy to remove it from the road before pursuing vehicles also run over it. The construction of the strip points the spikes into the tires as they pass over, and the spikes then detach and remain in the tires, their hollow construction assisting in the venting of air over ten to twenty seconds.

Shortly after the Defendant warned Cash to be on the lookout for stinger strips, Sergeant Jerry Mundy, of the Mount Juliet Police Department, deployed a stinger strip in an attempt to stop the Defendant's vehicle. The stretch of road in the vicinity of exit 226 is a wide section of road. There is a shoulder on the extreme left side of the road; an HOV (high occupancy vehicle) lane; a center lane; a right lane; and finally the gore,[2] which separates the right lane from the on-ramp. Evidence was presented showing that the Defendant could have avoided the stinger strip by steering her vehicle to the left, or she could have simply driven over it. However, after the stinger strip was deployed, the Mercedes changed course, moving from the center lane toward the right side of the road, in what seven witnesses described as a controlled turn. Traveling at an estimated 80 to 120 miles per hour, the Mercedes struck Sergeant Mundy. Immediately thereafter, it hit Wilson County Sheriff's Deputy John Musice, who was on the scene in support of Sergeant Mundy. Both Sergeant Mundy and Deputy Musice were killed immediately upon being struck by the Mercedes; their bodies being thrown from the points of impact 280 and 270 feet respectively.

There was no evidence that the Defendant attempted to use her brakes before the Mercedes hit Sergeant Mundy, but the impact with his body rendered the vehicle inoperable, shattering the windshield and crushing the driver's side fender, which caused the front driver's side tire to explode. The Mercedes eventually came to a stop after hitting the two officers and smashing into Deputy Musice's cruiser. The Defendant and Cash were taken into custody at the scene and transported via helicopter to the Vanderbilt University Medical Center.

At trial, the Defendant was convicted of two counts of first degree murder, and the trial court sentenced her to serve two consecutive life sentences with the Tennessee Department of Correction.

## II. Analysis

The Defendant now appeals, contending that the trial court erred when it: (1) allowed Kathleen Griffith, a witness not listed in discovery, to testify at trial; and (2) ordered the Defendant's sentences to run consecutively.

### A. Surprise Witness

The Defendant contends that the trial court erred in allowing an undisclosed witness, Kathleen Griffith, a former nurse at Vanderbilt Hospital, to testify at trial. The Defendant filed a pretrial motion requesting a list of the State's witnesses, and Griffith's name was not provided. The State contends they did not become aware of this witness until after the trial commenced, and they notified the Defendant's counsel immediately after they determined that they might call Griffith to testify.

At trial, Griffith testified that in July of 2003 she was a nurse at Vanderbilt Hospital. She stated that although the Defendant was not one of her patients, the Defendant summoned her for

---

[2]The thin triangle of pavement between the thru lanes and the exit lane or on ramp as they diverge.

assistance in calling the Defendant's grandmother. Griffith said that, at the time, she did not know who the Defendant was or why she was in the hospital and upon inquiring the Defendant stated "I am the one that killed those fucking cops."

The State is directed to list "the names of such witnesses as [it] intends shall be summoned in the cause" on the charging indictment. Tenn. Code Ann. § 40-17-106 (2003). The purpose of this statute is to prevent surprise to the defendant at trial and to permit the defendant to prepare his or her defense to the State's proof. However, this duty is merely directory, not mandatory. State v. Harris, 839 S.W.2d 54, 69 (Tenn. 1992). The State's failure to include a witness' name on the indictment will not automatically disqualify the witness from testifying. Id. A defendant will be entitled to relief for nondisclosure only if he or she can demonstrate prejudice, bad faith, or undue advantage. Id. The determination of whether to allow the witness to testify is left to the sound discretion of the trial judge. State v. Underwood, 669 S.W.2d 700, 703 (Tenn. Crim. App. 1984).

While the substance of Griffith's testimony was damaging, the Defendant must show she was prejudiced by the non-disclosure of the witness' identity, not by the testimony the witness offered. We have previously stated, "In this context, it is not the prejudice which resulted from the witness' testimony but the prejudice which resulted from the defendant's lack of notice which is relevant to establish prejudice." State v. Jesse Eugene Harris, No. 88-188-III, 1989 WL 60393, at *4 (Tenn. Crim. App., at Nashville, June 7, 1989) *perm. app. denied* (Tenn. Aug. 7, 1989). The Defendant in this case has simply failed to show how she was prejudiced by the late notice of Griffith's identity. Her trial counsel ably cross-examined Griffith. The Defendant has failed to show what more she could, or would, have done had she known about Griffith earlier.

Additionally, the Defendant has not demonstrated bad faith or undue advantage. Rather, it appears that the State made every effort to ensure that it provided the Defendant a list of all witnesses who would be testifying against her at trial. The reason that Griffith was not on that list was because she had not shared the substance of what would become her testimony with anyone, and she testified that she was not aware of the significance of the information she had until right before the trial, when she saw a news broadcast about the Defendant's case. She testified that after seeing the news story she discussed with her husband the statements that the Defendant made to her, and they decided that she should come forward with the information. As such, we are not persuaded by the Defendant's argument that the State acted in bad faith or in an attempt to gain an undue advantage, and therefore the Defendant is not entitled to relief on this issue.

### B. Consecutive Sentencing

The Defendant next contends that the trial court erred when it ordered that her sentences run consecutively. With regard to this issue, the Defendant fails to provide any specific argument or citation to any law for this proposition. Issues which are not supported by argument, citation to authorities, or appropriate references to the record may be treated as waived in this court. Tenn. R. App. P. 27(a)(7). Nonetheless, we elect to review the Defendant's contention.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a *de novo* review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597, 600 (Tenn. 1994). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. Tenn. Code Ann. § 40-35-401 (2003), Sentencing Commission Comments. Our review of the record indicates that the trial court carefully and diligently considered the sentencing principles and all relevant facts and circumstances. Therefore, we review its decision *de novo* with a presumption of correctness.

Our review requires an analysis of:(1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in her own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210 (2003); State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

> In Tennessee, consecutive sentencing is permitted when any of the following criteria are met:
> (1) The defendant is a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood;
> (2) The defendant is an offender whose record of criminal activity is extensive;
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;
> (6) The defendant is sentenced for an offense committed while on probation; or
> (7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b) (2003).

Additionally, the length of the sentence, when consecutive in nature, must be "justly deserved in relation to the seriousness of the offense," Tennessee Code Annotated § 40-35-102(1) (2003), and

"no greater than that deserved" under the circumstances, Tennessee Code Annotated § 40-35-103(2) (2003), and State v. Lane, 3 S.W.3d 456 (Tenn. 1999).

In the case at hand, the trial court found that the Defendant qualified for consecutive sentencing because she: (1) had an extensive record of criminal activity; (2) is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high; and (3) was on probation at the time of the offense. Tenn. Code Ann. § 40-35-115(b)(2),(4), & (6).

These findings are uncontroverted by the Defendant, who nonetheless argues that the time that elapsed between killing Sergeant Mundy and Deputy Musice was so brief that the two murders should not be considered separate acts for sentencing purposes. As noted above, the Defendant cites no authority for this position, and we do not find her argument persuasive. The Defendant was indicted on two separate counts of first degree murder, and the validity of those indictments was not challenged. The jury returned a guilty verdict on each count of first degree murder, therefore, the only issue is the propriety of the consecutive life sentences imposed, not whether the offense was a single homicidal act or multiple homicidal acts. Because three of the statutory criteria for consecutive sentencing apply in this case, the decision to run the sentences concurrently or consecutively was within the discretion of the trial court. See State v. Hastings, 25 S.W.3d 178, 181 (Tenn. Crim. App. 1999). The trial court clearly articulated its reasons for imposing consecutive sentences, stating:

> I must find . . . that one or more of the factors in 40-35-115 is present. As I've said, I only have to find by the weight of the evidence one of those factors in order to impose consecutive sentences, but the Attorney General is correct in submitting to me that there are three that likely apply, so in order, one, the defendant is an offender whose record of criminal activity is extensive. All I have to do is examine the presentence report, and I've, of course, heard the testimony of the officer that prepared that report. The defendant said she had over 36 convictions, I think, in Blount, Knox, Sevier, Davidson, Carter and perhaps Coffee counties . . . so clearly, she has, by more than the weight of the evidence, a history of criminal activity.

> The second category that applies in this case is whether or not she's a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high . . . . The Court record in this case speaks for itself . . . she was driving in excess of 100 miles an hour down Interstate 40 at various stages. I seem to recall one witness even saying it could have been as high as 140 or 150 miles per hour . . . about 180 or 85 feet per second. She deliberately slammed her vehicle into a Knoxville police officer's cruiser and sped away . . . . [A]s she approached that overpass at the Mt. Juliet exit here in Wilson County, the fateful words were "watch this," and she moved in a controlled fashion in the center lane and directly toward those two officers.

The physical evidence at the scene was that there were no skid marks, no yawl marks, nothing to indicate other than she was in complete control of that vehicle, yet there was still an out for her. She could have gone left into the left lane. She could have gone farther left into the shoulder lane adjacent to that concrete wall, but no, she turned right heading right for the officers.

[A]t 100 miles an hour, she had six or seven seconds to [] maneuver, six or seven seconds judgment reflection, time to say "watch this," no brake lights, no skid marks, no yawl.

The defendant's post event statements seem to corroborate that she had little or no regard for human life and no hesitancy about committing this crime . . . .

The last factor is that she was on probation. In his opening statement to the jury, Mr. Garrett even acknowledged this, and, of course, I've heard that proof here today, and the presentence report establishes [that the Defendant was on probation at the time the offense was committed].

The record reflects that all three of the trial court's findings are supported by the evidence, and it is necessary to find the presence of only one of the statutory categories listed in Tennessee Code Annotated section 40-35-115(b) to support the imposition of consecutive sentencing. State v. Adams, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997). We conclude that the trial court did not abuse its discretion when it ordered the sentences run consecutively, therefore, the Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the foregoing, we conclude that the trial court committed no reversible error. Therefore, the judgments of the trial court are affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE